# CAMPS NEWFOUND/OWATONNA, INC. *v.* TOWN OF HARRISON ET AL.

No. 94–1988.   Argued October 9, 1996—Decided May 19, 1997

*William H. Dempsey* argued the cause for petitioner. With him on the briefs were *Robert B. Wasserman, William H. Dale, Emily A. Bloch,* and *Sally J. Daggett.*

*William L. Plouffe* argued the cause and filed a brief for respondents.*

JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether an otherwise generally applicable state property tax violates the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3, because its exemption for property owned by charitable institutions excludes organizations operated principally for the benefit of nonresidents.

I

Petitioner is a Maine nonprofit corporation that operates a summer camp for the benefit of children of the Christian Science faith. The regimen at the camp includes supervised prayer, meditation, and church services designed to help the children grow spiritually and physically in accordance with the tenets of their religion. App. 40–41. About 95 percent of the campers are not residents of Maine. *Id.*, at 44.

The camp is located in the town of Harrison (Town); it occupies 180 acres on the shores of a lake about 40 miles northwest of Portland. Brief for Respondents 4, and n. 6. Petitioner's revenues include camper tuition averaging about $400 per week for each student, contributions from private donors, and income from a "modest endowment." App. 42, 51. In recent years, the camp has had an annual operating deficit of approximately $175,000. *Id.*, at 41. From 1989 to 1991, it paid over $20,000 in real estate and personal property taxes each year.[1] *Id.*, at 42–43.

---

*Briefs of *amici curiae* urging reversal were filed for the American Council on Education et al. by *Sheldon Elliot Steinbach, Carter G. Phillips, Nathan C. Sheers,* and *Adam Yarmolinsky;* and for the Christian Legal Society et al. by *James C. Geoly, Kevin R. Gustafson,* and *Steven T. McFarland.*

[1] Most of petitioner's tax bill was for real estate taxes. See, *e. g.,* App. 43 (petitioner paid 1991 real estate taxes of $20,770.71 and personal property taxes of $994.70).

The Maine statute at issue, Me. Rev. Stat. Ann., Tit. 36, § 652(1)(A) (Supp. 1996), provides a general exemption from real estate and personal property taxes for "benevolent and charitable institutions incorporated" in the State. With respect to institutions that are "in fact conducted or operated principally for the benefit of persons who are not residents of Maine," however, a charity may only qualify for a more limited tax benefit, and then only if the weekly charge for services provided does not exceed $30 per person. § 652(1)(A)(1).[2]   Because most of the campers come from out

---

[2] The statute provides:

"The following property of institutions and organizations is exempt from taxation:

"1. Property of institutions and organizations.

"A. The real estate and personal property owned and occupied or used solely for their own purposes by benevolent and charitable institutions incorporated by this State, and none of these may be deprived of the right of exemption by reason of the source from which its funds are derived or by reason of limitation in the classes of persons for whose benefit such funds are applied.

"(1) Any such institution that is in fact conducted or operated principally for the benefit of persons who are not residents of Maine is entitled to an exemption not to exceed $50,000 of current just value only when the total amount of any stipends or charges that it makes or takes during any tax year, as defined by section 502, for its services, benefits or advantages divided by the total number of persons receiving such services, benefits or advantages during the same tax year does not result in an average rate in excess of $30 per week when said weekly rate is computed by dividing the average yearly charge per person by the total number of weeks in a tax year during which such institution is in fact conducted or operated principally for the benefit of persons who are not residents of Maine. No such institution that is in fact conducted or operated principally for the benefit of persons who are not residents of Maine and makes charges that result in an average weekly rate per person, as computed under this subparagraph, in excess of $30 may be entitled to tax exemption. This subparagraph does not apply to institutions incorporated as nonprofit corporations for the sole purpose of conducting medical research.

"For the purposes of this paragraph, 'benevolent and charitable institutions' include, but are not limited to, nonprofit nursing homes and nonprofit

of State, petitioner could not qualify for a complete exemption.[3] And, since the weekly tuition was roughly $400, petitioner was ineligible for any charitable tax exemption at all.

In 1992 petitioner made a formal request to the Town for a refund of taxes paid from 1989 through 1991, and a continuing exemption from future property taxes, based principally on. a claim that the tax exemption statute violated the Commerce Clause of the Federal Constitution.[4] The request was denied, and petitioner filed suit in the Superior Court against the Town and its tax assessors and collectors.[5] After the

---

boarding homes and boarding care facilities licensed by the Department of Human Services pursuant to Title 22, chapter 1665 or its successor, nonprofit community mental health service facilities licensed by the Commissioner of Mental Health, Mental Retardation, and Substance Abuse Services, pursuant to Title 34–B, chapter 3 and nonprofit child care centers incorporated by this State as benevolent and charitable institutions. For the purposes of this paragraph, 'nonprofit' means a facility exempt from taxation under Section 501(c)(3) of the Code . . . ." Me. Rev. Stat. Ann., Tit. 36, §652(1)(A) (Supp. 1996).

[3] The statute's language reserving the property tax exemption for those entities operated "principally for the benefit" of Maine residents is not without ambiguity. The parties are in agreement, however, that because petitioner's camp is attended almost entirely by out-of-staters, it would not qualify for the exemption under any reading of the language. See Brief for Petitioner 2; Brief for Respondents 2, n. 3; Tr. of Oral Arg. 36. The courts below appear to have presumed the same, and we of course accept their interpretation of state law.

[4] Petitioner also argued below that the Maine statute violated the Equal Protection Clauses of the United States and Maine Constitutions, and the Privileges and Immunities Clause, Art. IV, §2, of the Federal Constitution. The Maine Supreme Judicial Court had already found the statute constitutional under an equal protection analysis in a prior decision, and adhered to its earlier view. See Green Acre Baha'i Institute v. Eliot, 159 Me. 395, 193 A. 2d 564 (1963); 655 A. 2d 876, 879–880 (1995). As for the privileges and immunities claim, the Supreme Judicial Court found petitioner's argument unavailing. Id., at 880. These claims are not before us.

[5] The Superior Court referred to all of the original defendants as "Municipal Defendants" because the State of Maine intervened to defend the constitutionality of its statute. App. to Pet. for Cert. 9a. However, the

parties agreed on the relevant facts, they filed cross-motions for summary judgment. The Superior Court ruled for petitioner, explaining that under Maine's statute:

> "Denial of a tax exemption is explicitly and primarily triggered by engaging in a certain level of interstate commerce. This denial makes operation of the institutions serving non-residents more expensive. This increased cost results from an impermissible distinction between in-state and out-of-state consumers. *See Commonwealth Edison Co.*, 453 U. S., at 617–19. . . . Maine's charitable tax exemption is denied, not because there is a difference between the activities of charitable institutions serving residents and non-residents, but because of the residency of the people whom the institutions serve." App. to Pet. for Cert. 14a–15a (footnote omitted).

The Town, but not the State, appealed and the Maine Supreme Judicial Court reversed. 655 A. 2d 876 (1995). Noting that a Maine statute[6] characterized tax exemptions as "tax expenditures," it viewed the exemption for charitable institutions as the equivalent of a purchase of their services. *Id.*, at 878. Because the exemption statute "treats all Maine charities alike"—given the fact that "all have the opportunity to qualify for an exemption by choosing to dispense the majority of their charity locally"—it "regulates evenhandedly with only incidental effects on interstate commerce." *Id.*, at 879. In the absence of evidence that petitioner's camp "*competes* with other summer camps outside of or within Maine," or that the statute "impedes interstate travel" or that it "provides services that are necessary for interstate travel," the Court concluded that petitioner had

---

State did not appeal the adverse decision of the Superior Court and, therefore, is not a respondent in this Court. We shall use the term "Town" to refer to the respondents collectively.

[6] Me. Rev. Stat. Ann., Tit. 36, § 196 (1990).

"not met its heavy burden of persuasion that the statute is unconstitutional." *Ibid.*

We granted certiorari. 516 U. S. 1157. For the reasons that follow, we now reverse.

## II

During the first years of our history as an independent confederation, the National Government lacked the power to regulate commerce among the States. Because each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents, what Justice Johnson characterized as a "conflict of commercial regulations, destructive to the harmony of the States," ensued. See *Gibbons* v. *Ogden,* 9 Wheat. 1, 224 (1824) (opinion concurring in judgment). In his view, this "was the immediate cause that led to the forming of a [constitutional] convention." *Ibid.* "If there was any one object riding over every other in the adoption of the constitution, it was to keep the commercial intercourse among the States free from all invidious and partial restraints." *Id.,* at 231.[7]

We have subsequently endorsed Justice Johnson's appraisal of the central importance of federal control over interstate and foreign commerce and, more narrowly, his conclusion that the Commerce Clause had not only granted Congress express authority to override restrictive and conflicting commercial regulations adopted by the States, but that it also had immediately effected a curtailment of state power. "In short, the Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States. *Southern Pacific Co.* v. *Arizona ex rel.*

---

[7] See also *West Lynn Creamery, Inc.* v. *Healy,* 512 U. S. 186, 193, n. 9 (1994) (noting that "[t]he 'negative' aspect of the Commerce Clause was considered the more important by the 'father of the Constitution,' James Madison"); *Hughes* v. *Oklahoma,* 441 U. S. 322, 325–326 (1979); *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794, 807, n. 16 (1976) (quoting W. Rutledge, A Declaration of Legal Faith 25–26 (1947)).

*Sullivan,* 325 U. S. 761 [(1945)]; *Morgan* v. *Virginia,* 328 U. S. 373 [(1946)]." *Freeman* v. *Hewit,* 329 U. S. 249, 252 (1946). Our decisions on this point reflect, "upon fullest consideration, the course of adjudication unbroken through the Nation's history." *Ibid.* See also *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 534–535 (1949). Although Congress unquestionably has the power to repudiate or substantially modify that course of adjudication,[8] it has not done so.

This case involves an issue that we have not previously addressed—the disparate real estate tax treatment of a nonprofit service provider based on the residence of the consumers that it serves. The Town argues that our dormant Commerce Clause jurisprudence is wholly inapplicable to this case, because interstate commerce is not implicated here and Congress has no power to enact a tax on real estate. We first reject these arguments, and then explain why we think our prior cases make it clear that if profit-making enterprises were at issue, Maine could not tax petitioner more heavily than other camp operators simply because its campers come principally from other States. We next address the novel question whether a different rule should apply to a discriminatory tax exemption for charitable and benevolent institutions. Finally, we reject the Town's argument that the exemption should either be viewed as a permissible subsidy or as a purchase of services by the State acting as a "market participant."

### III

We are unpersuaded by the Town's argument that the dormant Commerce Clause is inapplicable here, either because campers are not "articles of commerce" or, more generally, because the camp's "product is delivered and 'consumed' entirely within Maine." Brief for Respondents

---

[8] See *New York* v. *United States,* 505 U. S. 144, 171 (1992); *Quill Corp.* v. *North Dakota,* 504 U. S. 298, 318 (1992); *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 429–430, 434–435 (1946).

17–18. Even though petitioner's camp does not make a profit, it is unquestionably engaged in commerce, not only as a purchaser, see *Katzenbach* v. *McClung*, 379 U. S. 294, 300–301 (1964); *United States* v. *Lopez*, 514 U. S. 549, 558 (1995), but also as a provider of goods and services. It markets those services, together with an opportunity to enjoy the natural beauty of an inland lake in Maine, to campers who are attracted to its facility from all parts of the Nation. The record reflects that petitioner "advertises for campers in [out-of-state] periodicals . . . and sends its Executive Director annually on camper recruiting trips across the country." App. 49–50. Petitioner's efforts are quite successful; 95 percent of its campers come from out of State. The attendance of these campers necessarily generates the transportation of persons across state lines that has long been recognized as a form of "commerce." *Edwards* v. *California*, 314 U. S. 160, 172 (1941); see also *Caminetti* v. *United States*, 242 U. S. 470, 491 (1917); *Hoke* v. *United States*, 227 U. S. 308, 320 (1913).

Summer camps are comparable to hotels that offer their guests goods and services that are consumed locally. In *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241 (1964), we recognized that interstate commerce is substantially affected by the activities of a hotel that "solicits patronage from outside the State of Georgia through various national advertising media, including magazines of national circulation." *Id.*, at 243. In that case, we held that commerce was substantially affected by private race discrimination that limited access to the hotel and thereby impeded interstate commerce in the form of travel. *Id.*, at 244, 258; see *Lopez*, 514 U. S., at 558–559. Official discrimination that limits the access of nonresidents to summer camps creates a similar impediment. Even when business activities are purely local, if " 'it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.' " *Heart of Atlanta*, 379 U. S., at 258

(quoting *United States* v. *Women's Sportswear Mfrs. Assn.*, 336 U. S. 460, 464 (1949)).

Although *Heart of Atlanta* involved Congress' affirmative Commerce Clause powers, its reasoning is applicable here. As we stated in *Hughes* v. *Oklahoma*, 441 U. S. 322 (1979): "The definition of 'commerce' is the same when relied on to strike down or restrict state legislation as when relied on to support some exertion of federal control or regulation." *Id.*, at 326, n. 2. That case in turn rested upon our reasoning in *Philadelphia* v. *New Jersey*, 437 U. S. 617 (1978), in which we rejected a "two-tiered definition of commerce." *Id.*, at 622. "Just as Congress ha[d] power to regulate the interstate movement of [the] wastes" at issue in that case, so too we held were States "not free from constitutional scrutiny when they restrict that movement." *Id.*, at 622–623. See also *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941, 953 (1982).

The Town's arguments that the dormant Commerce Clause is inapplicable to petitioner because the campers are not "articles of commerce," or more generally that interstate commerce is not at issue here, are therefore unpersuasive. The services that petitioner provides to its principally out-of-state campers clearly have a substantial effect on commerce, as do state restrictions on making those services available to nonresidents. Cf. *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383, 391 (1994).

The Town also argues that the dormant Commerce Clause is inapplicable because a real estate tax is at issue. We disagree. A tax on real estate, like any other tax, may impermissibly burden interstate commerce. We may assume as the Town argues (though the question is not before us) that Congress could not impose a national real estate tax. It does not follow that the States may impose real estate taxes in a manner that discriminates against interstate commerce. A State's "power to lay and collect taxes, comprehensive and necessary as that power is, cannot be exerted in a way which

involves a discrimination against [interstate] commerce." *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 596 (1923).

To allow a State to avoid the strictures of the dormant Commerce Clause by the simple device of labeling its discriminatory tax a levy on real estate would destroy the barrier against protectionism that the Constitution provides. We noted in *West Lynn Creamery, Inc.* v. *Healy,* 512 U. S. 186 (1994), that "[t]he paradigmatic . . . law discriminating against interstate commerce is the protective [import] tariff or customs duty, which taxes goods imported from other States, but does not tax similar products produced in State." *Id.,* at 193. Such tariffs are "so patently unconstitutional that our cases reveal not a single attempt by a State to enact one." *Ibid.* Yet, were the Town's theory adopted, a State could create just such a tariff with ease. The State would need only to pass a statute imposing a special real estate tax on property used to store, process, or sell imported goods. By gearing the increased tax to the value of the imported goods at issue, the State could create the functional equivalent of an import tariff. As this example demonstrates, to accept the Town's theory would have radical and unacceptable results.

We therefore turn to the question whether our prior cases preclude a State from imposing a higher tax on a camp that serves principally nonresidents than on one that limits its services primarily to residents.

## IV

There is no question that were this statute targeted at profit-making entities, it would violate the dormant Commerce Clause. "State laws discriminating against interstate commerce on their face are 'virtually *per se* invalid.'" *Fulton Corp.* v. *Faulkner,* 516 U. S. 325, 331 (1996) (quoting *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.,* 511 U. S. 93, 99 (1994)). It is not necessary to look beyond the text of this statute to determine that it

discriminates against interstate commerce. The Maine law expressly distinguishes between entities that serve a principally interstate clientele and those that primarily serve an intrastate market, singling out camps that serve mostly in-staters for beneficial tax treatment, and penalizing those camps that do a principally interstate business. As a practical matter, the statute encourages affected entities to limit their out-of-state clientele, and penalizes the principally non-resident customers of businesses catering to a primarily interstate market.

If such a policy were implemented by a statutory prohibition against providing camp services to nonresidents, the statute would almost certainly be invalid. We have "consistently . . . held that the Commerce Clause . . . precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom." *New England Power Co.* v. *New Hampshire*, 455 U. S. 331, 338 (1982). Our authorities on this point date to the early part of the century.[9] Petitioner's "product" is

---

[9] In *West* v. *Kansas Natural Gas Co.*, 221 U. S. 229 (1911), we held invalid under the Commerce Clause an Oklahoma statute that had the effect of preventing out-of-state consumers from purchasing Oklahoma natural gas. We ruled similarly in *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923), that a West Virginia statute limiting out-of-state users' access to West Virginia gas to that not "required to meet the local needs for all purposes," *id.*, at 594, violated the Commerce Clause. We found those cases directly analogous in *New England Power*, ruling invalid a state law that reserved for state citizens domestically generated hydroelectric power. In *Philadelphia* v. *New Jersey*, 437 U. S. 617 (1978), we struck down a New Jersey statute prohibiting certain categories of out-of-state waste from flowing into the State's landfills, noting that "a State may not accord its own inhabitants a preferred right of access over consumers in other States to natural resources located within its borders." *Id.*, at 627. And, in *Hughes* v. *Oklahoma*, 441 U. S., at 338, we ruled that a statute prohibiting the export of minnows for sale out of State violated the Commerce Clause. We held similarly in *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941, 958 (1982), that a provision preventing the export of ground water to States not allowing reciprocal export rights was an impermissible barrier to com-

in part the natural beauty of Maine itself and, in addition, the special services that the camp provides. In this way, the Maine statute is like a law that burdens out-of-state access to domestically generated hydroelectric power, *New England Power*, or to local landfills, *Philadelphia* v. *New Jersey*, 437 U. S. 617 (1978). In those cases, as in this case, the burden fell on out-of-state access both to a natural resource and to related services provided by state residents.[10]

Avoiding this sort of "economic Balkanization," *Hughes* v. *Oklahoma*, 441 U. S., at 325, and the retaliatory acts of other States that may follow, is one of the central purposes of our negative Commerce Clause jurisprudence. See *ibid.; West* v. *Kansas Natural Gas Co.*, 221 U. S. 229, 255 (1911) (expressing concern that "embargo may be retaliated by embargo, and commerce will be halted at state lines"). And, as we noted in *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U. S. 573, 580 (1986): "Economic protectionism is not limited to attempts to convey advan-

merce. Insofar as *Sporhase* suggests certain narrow circumstances in which the reservation of natural resources for state citizens may be permissible, see *id.*, at 956–957, these concerns are not implicated here.

[10] We have long noted the applicability of our dormant Commerce Clause jurisprudence to service industries. See, *e. g., C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383, 391 (1994) ("[T]he article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it"); *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources*, 504 U. S. 353, 359 (1992) (noting that "arrangements between out-of-state generators of waste and the . . . operator of a waste disposal site" may be "viewed as 'sales' of garbage or 'purchases' of transportation and disposal services"); *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318, 337 (1977) ("[N]o State may discriminatorily tax . . . the business operations performed in any other State"); *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27, 42 (1980) (striking down state statute under dormant Commerce Clause that favored in-state over out-of-state entities in the investor services market). Given the substantial portion of the national economy now devoted to service industries, see Bureau of Census, Statistical Abstract of the United States 1995, p. 779 (Table 1288) (noting service industries constituted approximately 20 percent of gross domestic product in 1992), this is a natural development in our dormant Commerce Clause jurisprudence.

tages on local merchants; it may include attempts to give local consumers an advantage over consumers in other States."[11] By encouraging economic isolationism, prohibitions on out-of-state access to in-state resources serve the very evil that the dormant Commerce Clause was designed to prevent.

Of course, this case does not involve a total prohibition. Rather, the statute provides a strong incentive for affected entities not to do business with nonresidents if they are able to so avoid the discriminatory tax. In this way, the statute is similar to the North Carolina "intangibles tax" that we struck down in *Fulton Corp.* v. *Faulkner*, 516 U. S., at 327. That case involved the constitutionality under the Commerce Clause of a state "regime that taxe[d] stock [held by in-state shareholders] only to the degree that its issuing corporation participates in interstate commerce." *Id.*, at 333. We held the statute facially discriminatory, in part because it tended "to discourage domestic corporations from plying their trades in interstate commerce." *Ibid.* Maine's statute has a like effect.

To the extent that affected Maine organizations are not deterred by the statute from doing a principally interstate business, it is clear that discriminatory burdens on interstate commerce imposed by regulation or taxation may also violate the Commerce Clause. We have held that special fees assessed on nonresidents directly by the State when they attempt to use local services impose an impermissible burden on interstate commerce. See, *e. g., Chemical Waste Management, Inc.* v. *Hunt*, 504 U. S. 334, 342 (1992) (discriminatory tax imposed on disposal of out-of-state hazardous waste). That the tax discrimination comes in the form of a deprivation of a generally available tax benefit, rather than

---

[11] The Town argues that "the Commerce Clause protects out-of-state competitors but does not protect out-of state consumers." Brief for Respondents 16. As the discussion above indicates, our cases have rejected this view.

a specific penalty on the activity itself, is of no moment. Thus, in *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 274 (1988), the Court invalidated an Ohio statute that provided a tax credit for sales of ethanol produced in State, but not ethanol produced in certain other States; the law "deprive[d] certain products of generally available beneficial tax treatment because they are made in certain other States, and thus on its face appear[ed] to violate the cardinal requirement of nondiscrimination."[12]   Given the fact that the burden of Maine's facially discriminatory tax scheme falls by design in a predictably disproportionate way on out-of-staters,[13] the pernicious effect on interstate commerce is

---

[12] See *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 268 (1984) (discriminatory excise tax exemption); *Maryland* v. *Louisiana*, 451 U. S. 725, 756 (1981) (tax scheme "unquestionably discriminates against interstate commerce . . . as the necessary result of various tax credits and exclusions"); *Westinghouse Elec. Corp.* v. *Tully*, 466 U. S. 388, 399–400, and n. 9 (1984) *(per curiam);* see also *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S., at 210 (SCALIA, J., concurring in judgment).

[13] Because the Maine tax is facially discriminatory, this case is unlike *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609 (1981).   There, we held permissible under the Commerce Clause a generally applicable Montana severance tax on coal extracted from in-state mines.   Appellants challenged the tax arguing, *inter alia*, that it discriminated against interstate commerce because 90 percent of the coal happened to be shipped to out-of-state users, and the tax burden was therefore borne principally by nonresidents.   We rejected this claim, noting that "there is no real discrimination in this case; the tax burden is borne according to the amount of coal consumed and not according to any distinction between in-state and out-of-state consumers."   *Id.*, at 619.   We recognized that an approach to the dormant Commerce Clause requiring an assessment of the likely demand for a particular good by nonresidents and a State's ability to shift its tax burden out of State "would require complex factual inquiries about such issues as elasticity of demand for the product and alternative sources of supply," *id.*, at 619, n. 8, and declined to adopt such a difficult to police test.   Here, in contrast, the tax scheme functions by design and on its face to burden out-of-state users disproportionately.   Our analysis in *Commonwealth Edison* is therefore inapplicable.

*CTS Corp.* v. *Dynamics Corp. of America*, 481 U. S. 69 (1987), is also inapposite.   In that case, we rejected the argument that a facially nondis-

the same as in our cases involving taxes targeting out-of-staters alone.

Unlike in *Chemical Waste,* we recognize that here the discriminatory burden is imposed on the out-of-state customer indirectly by means of a tax on the entity transacting business with the non-Maine customer. This distinction makes no analytic difference. As we noted in *West Lynn Creamery* discussing the general phenomenon of import tariffs: "For over 150 years, our cases have rightly concluded that the imposition of a differential burden on any part of the stream of commerce—from wholesaler to retailer to consumer—is invalid, because a burden placed at any point will result in a disadvantage to the out-of-state producer." 512 U. S., at 202 (citing cases). So too here, it matters little that it is the camp that is taxed rather than the campers. The record demonstrates that the economic incidence of the tax falls at least in part on the campers, the Town has not contested the point, and the courts below based their decision on this presumption. App. 49; 655 A. 2d, at 879; App. to Pet. for Cert. 14a, n. 2.[14]

With respect to those businesses—like petitioner's—that continue to engage in a primarily interstate trade, the Maine statute therefore functionally serves as an export tariff that targets out-of-state consumers by taxing the businesses that

---

criminatory state law deterring hostile tender offers violated the dormant Commerce Clause because most such offers "are launched by offerors outside Indiana." *Id.,* at 88. We explained that "nothing *in the . . . Act* imposes a greater burden on out-of-state offerors than it does on similarly situated Indiana offerors." *Ibid.* (emphasis added). Here, the discrimination appears on the face of the Maine statute. *Exxon Corp.* v. *Governor of Maryland,* 437 U. S. 117 (1978), is similarly distinguishable. See *id.,* at 126 ("The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce").

[14] We therefore have no need to consider these matters further. Cf. *Fulton Corp.* v. *Faulkner,* 516 U. S. 325, 341 (1996) (noting "complexity of economic incidence analysis").

principally serve them. As our cases make clear, this sort of discrimination is at the very core of activities forbidden by the dormant Commerce Clause. " '[A] State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State.'" *Chemical Waste*, 504 U. S., at 342 (quoting *Armco Inc.* v. *Hardesty*, 467 U. S. 638, 642 (1984)); see *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S., at 193 (tariffs forbidden by the dormant Commerce Clause).

Ninety-five percent of petitioner's campers come from out of State. Insofar as Maine's discriminatory tax has increased tuition, that burden is felt almost entirely by out-of-staters, deterring them from enjoying the benefits of camping in Maine.[15] In sum, the Maine statute facially discriminates against interstate commerce, and is all but *per se* invalid. See, *e. g.*, *Oregon Waste*, 511 U. S., at 100–101.

We recognize that the Town might have attempted to defend the Maine law under the *per se* rule by demonstrating that it " 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Id.*, at 101 (quoting *New Energy Co.*, 486 U. S., at 278). In assessing respondents' arguments, we would have applied our "strictest scrutiny." *Hughes* v. *Oklahoma*, 441

---

[15] The Town argues that these effects are entirely speculative, because the record does not reflect any decision by a potential camper not to attend petitioner's camp as a result of the burden imposed. Brief for Respondents 16. The Supreme Judicial Court appears to have adopted similar reasoning. 655 A. 2d, at 879. This misconstrues the proper analysis. As we made clear most recently in *Fulton Corp.* v. *Faulkner*, 516 U. S., at 333, n. 3, there is no " '*de minimis*' defense to a charge of discriminatory taxation under the Commerce Clause." A particularized showing of the sort respondent seeks is not required. See *Associated Industries of Mo.* v. *Lohman*, 511 U. S. 641, 650 (1994) ("[A]ctual discrimination, wherever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred"); *Maryland* v. *Louisiana*, 451 U. S., at 756; see also *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S., at 334, n. 13.

U. S., at 337. This is an extremely difficult burden, "so heavy that 'facial discrimination by itself may be a fatal defect.'" *Oregon Waste*, 511 U. S., at 101 (quoting *Hughes*, 441 U. S., at 337); see *Chemical Waste Management, Inc.* v. *Hunt*, 504 U. S., at 342 ("Once a state tax is found to discriminate against out-of-state commerce, it is typically struck down without further inquiry"). Perhaps realizing the weight of its burden, the Town has made no effort to defend the statute under the *per se* rule, and so we do not address this question. See *Fulton Corp.* v. *Faulkner*, 516 U. S., at 333–334.[16] We have no doubt that if petitioner's camp were

---

[16] JUSTICE SCALIA submits that we err by following our precedent in *Fulton* and declining to address an argument that the Town itself did not think worthy of pressing. *Post*, at 602–603. But even if there were reason to consider the State's compliance with the *per se* rule, the Town would not prevail. In the single case JUSTICE SCALIA points to in which we found the *per se* standard to have been met, *Maine* v. *Taylor*, 477 U. S. 131 (1986), the State had no "'reasonable nondiscriminatory alternatives,'" *Oregon Waste*, 511 U. S., at 101 (quoting *New Energy Co.*, 486 U. S., at 278), to the action it had taken. Absent a bar on the import of certain minnows, there was no way for Maine to protect its natural environment from the hazard of parasites and nonnative species that might have been accidentally introduced into the State's waters. *Taylor*, 477 U. S., at 141.

In contrast, here Maine has ample alternatives short of a facially discriminatory property tax exemption to achieve its apparent goal of subsidizing the attendance of the State's children at summer camp. Maine could, for example, achieve this end by offering direct financial support to parents of resident children. Cf. *Shapiro* v. *Thompson*, 394 U. S. 618 (1969). Though we have not had the occasion to address the issue, it might also be permissible for the State to subsidize Maine camps directly to the extent that they serve residents. See *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S., at 199, n. 15; *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 278 (1988) (noting that "[d]irect subsidization of domestic industry does not ordinarily run afoul" of the Commerce Clause); *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S., at 816 (STEVENS, J., concurring).

While the Town does argue its case under the less exacting analysis set forth in, *e. g.*, *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970), "this lesser scrutiny is only available 'where other [nondiscriminatory] legislative objectives are credibly advanced *and* there is *no* patent discrimination

a profit-making entity, the discriminatory tax exemption would be impermissible.

V

The unresolved question presented by this case is whether a different rule should apply to tax exemptions for charitable and benevolent institutions. Though we have never had cause to address the issue directly, the applicability of the dormant Commerce Clause to the nonprofit sector of the economy follows from our prior decisions.

Our cases have frequently applied laws regulating commerce to not-for-profit institutions. In *Associated Press* v. *NLRB*, 301 U. S. 103 (1937), for example, we held the National Labor Relations Act as applied to the Associated Press' (A. P.'s) newsgathering activities to be an enactment entirely within Congress' Commerce Clause power, despite the fact that the A. P. "does not sell news and does not operate for a profit." *Id.*, at 129. Noting that the A. P.'s activities "involve[d] the constant use of channels of interstate and foreign communication," we concluded that its operations "amount[ed] to commercial intercourse, and such intercourse is commerce within the meaning of the Constitution." *Id.*,

---

against interstate trade.'" *Chemical Waste*, 504 U. S., at 343, n. 5 (quoting *Philadelphia* v. *New Jersey*, 437 U. S., at 624 (emphasis added)). Because the Maine statute is facially discriminatory, the more deferential standard is inapplicable. Contrary to JUSTICE SCALIA's suggestion, this case is quite unlike *General Motors Corp.* v. *Tracy*, 519 U. S. 278 (1997). There, the Court premised its holding that the statute at issue was not facially discriminatory on the view that sellers of "bundled" and "unbundled" natural gas were principally competing in different markets. See *id.*, at 297–298, 300 ("dormant Commerce Clause protects markets and participants in markets, not taxpayers as such"). While it may be true that "[d]isparate treatment constitutes discrimination only if the objects of the disparate treatment are . . . similarly situated," *post*, at 601, there is no question that the statute at issue here is facially discriminatory because it disparately treats identically situated Maine nonprofit camps depending upon whether they favor in-state, as opposed to out-of-state, campers.

at 128. See also *Polish National Alliance of United States v. NLRB*, 322 U. S. 643 (1944).

We have similarly held that federal antitrust laws are applicable to the anticompetitive activities of nonprofit organizations. See *National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.*, 468 U. S. 85, 100, n. 22 (1984) (Sherman Act § 1 applies to nonprofits); *American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U. S. 556, 576 (1982) ("[I]t is beyond debate that nonprofit organizations can be held liable under the antitrust laws"); *Goldfarb v. Virginia State Bar*, 421 U. S. 773 (1975). The nonprofit character of an enterprise does not place it beyond the purview of federal laws regulating commerce. See also *NLRB v. Yeshiva Univ.*, 444 U. S. 672, 681, n. 11 (1980) (noting that in context of amendments to National Labor Relations Act "Congress appears to have agreed that nonprofit institutions 'affect commerce' under modern economic conditions").

We have already held that the dormant Commerce Clause is applicable to activities undertaken without the intention of earning a profit. In *Edwards v. California*, 314 U. S. 160 (1941), we addressed the constitutionality of a California statute prohibiting the transport into that State of indigent persons. We struck the statute down as a violation of the dormant Commerce Clause, reasoning that "the transportation of persons is 'commerce,'" and that the California statute was an "unconstitutional barrier to [that] interstate commerce." *Id.*, at 172–173. In determining whether the transportation of persons is "commerce," we noted that "[i]t is immaterial whether or not the transportation is commercial in character." *Id.*, at 172, n. 1.

We see no reason why the nonprofit character of an enterprise should exclude it from the coverage of either the affirmative or the negative aspect of the Commerce Clause. See *Hughes*, 441 U. S., at 326, n. 2; *Philadelphia v. New Jersey*, 437 U. S., at 621–623 (rejecting "two-tiered definition of commerce"); *Sporhase*, 458 U. S., at 953; see also *supra*, at

572–574. There are a number of lines of commerce in which both for-profit and nonprofit entities participate. Some educational institutions, some hospitals, some child care facilities, some research organizations, and some museums generate significant earnings; and some are operated by not-for-profit corporations. See Hansmann, The Role of Nonprofit Enterprise, 89 Yale L. J. 835, 835, and n. 1, 865 (1980).

A nonprofit entity is ordinarily understood to differ from a for-profit corporation principally because it "is barred from distributing its net earnings, if any, to individuals who exercise control over it, such as members, officers, directors, or trustees." *Id.*, at 838.[17] Nothing intrinsic to the nature of nonprofit entities prevents them from engaging in interstate commerce. Summer camps may be operated as for-profit or nonprofit entities; nonprofits may depend—as here—in substantial part on fees charged for their services. Clotfelter, The Distributional Consequences of Nonprofit Activities, in Who Benefits from the Nonprofit Sector? 1, 6 (C. Clotfelter ed. 1992) (nonprofits in some sectors are "heavily dependent on fees by paying customers, with private payments accounting for at least half of total revenues"). Whether operated on a for-profit or nonprofit basis, they purchase goods and

---

[17] Maine's law governing nonprofits embraces this conception, see Me. Rev. Stat. Ann., Tit. 13–B, § 102(9) (1981), as does the tax exemption statute at issue here. The exemption applies to "benevolent and charitable institutions." Me. Rev. Stat. Ann., Tit. 36, § 652(1)(A) (Supp. 1996). To qualify, the entity must devote "[a]ll profits derived from [its] operation . . . and the proceeds from the sale of its property . . . exclusively to the purposes for which it is organized." § 652(1)(C)(3). "A director, trustee, officer or employee of an organization claiming exemption is not entitled to receive directly or indirectly any pecuniary profit from the operation of that organization, excepting reasonable compensation for services in effecting its purposes." § 652(1)(C)(2). The statute also expressly designates certain categories of entities (nonprofit nursing homes, boarding homes, community mental health service facilities, and child care centers) that qualify for tax exempt status under federal law, 26 U. S. C. § 501(c)(3), as falling within its ambit. See Me. Rev. Stat. Ann., Tit. 36, § 652(1)(A) (Supp. 1996) (" '[B]enevolent and charitable institutions' include, but are not limited to, [the specified entities]").

services in competitive markets, offer their facilities to a variety of patrons, and derive revenues from a variety of sources, some of which are local and some out of State.

For purposes of Commerce Clause analysis, any categorical distinction between the activities of profit-making enterprises and not-for-profit entities is therefore wholly illusory. Entities in both categories are major participants in interstate markets. And, although the summer camp involved in this case may have a relatively insignificant impact on the commerce of the entire Nation, the interstate commercial activities of nonprofit entities as a class are unquestionably significant.[18] See *Wickard* v. *Filburn*, 317 U. S. 111, 127–128 (1942); *Lopez*, 514 U. S., at 556, 559–560.

---

[18] We are informed by *amici* that "the nonprofit sector spends over $389 billion each year in operating expenses—approximately seven percent of the gross national product." Brief for American Council on Education et al. as *Amici Curiae* 19. In recent years, nonprofits have employed approximately seven percent of the Nation's paid workers, roughly 9.3 million people in 1990. V. Hodgkinson, M. Weitzman, C. Toppe, & S. Noga, Nonprofit Almanac 1992–1993: Dimensions of the Independent Sector 29 (1992) (Table 1.5).

JUSTICE SCALIA wrongly suggests that Maine's law offers only a "narrow tax exemption," *post*, at 598, which he implies has no substantial effect on interstate commerce and serves only "to relieve the State of its burden of caring for its residents," *post*, at 596. This characterization is quite misleading. The statute expressly exempts from tax property used by such important nonprofit service industries as nursing homes and child care centers. See Me. Rev. Stat. Ann., Tit. 36, § 652(1)(A)(1) (Supp. 1996). Nonprofit participation in these sectors is substantial. Nationally, nonprofit nursing homes had estimated revenues of $18 billion in 1994. U. S. Bureau of the Census, Service Annual Survey: 1994 (1996) (Table 7.3). These entities compete with a sizeable for-profit nursing home sector, which had revenues of approximately $40 billion in 1994. *Id.*, at Table 7.1. Similarly, the $5 billion nonprofit market in child day care services competes with an $11 billion for-profit industry. *Id.*, at Tables 8.1, 8.3 (1994 data).

Nonprofit hospitals and health maintenance organizations also receive an exemption from Maine's property tax. See Me. Rev. Stat. Ann., Tit.

From the State's standpoint it may well be reasonable to use tax exemptions as a means of encouraging nonprofit institutions to favor local citizens, notwithstanding any possible adverse impact on the larger markets in which those in-

36, §§ 652(1)(A), (K) (Supp. 1996). While operating as nonprofit entities, their activities are serious business. In *Maine Medical Center* v. *Lucci*, 317 A. 2d 1 (1974), the Supreme Judicial Court presumed that a "large hospital" employing 2,000 people qualified as a "benevolent and charitable institution" for purposes of the § 652(1)(A) exemption, and held that a newly constructed $3.3 million parking facility—which patients, visitors, and staff were charged a fee to use—was also exempt from the tax. Though the garage was being operated at an immediate loss, "projected estimates of income and expense indicated a possible recovery of the capital investment over a period of twenty years." *Id.*, at 2. Nonprofit hospitals had national revenues of roughly $305 billion in 1994, considerably more than the $34 billion in revenues collected by hospitals operated on a for-profit basis. U. S. Bureau of the Census, Service Annual Survey: 1994 (1996) (Tables 7.1, 7.3).

Maine law further permits qualifying nonprofits to rent out their property on a commercial basis at market rates in order to support other activities, so long as that use of the property is only incidental to their own purposes. See *Maine Medical Center*, 317 A. 2d, at 2 (citing with approval *Curtis* v. *Androscoggin Lodge, No. 24, Independent Order of Odd Fellows*, 99 Me. 356, 360, 59 A. 518, 520 (1904)); *State Young Men's Christian Assn.* v. *Winthrop*, 295 A. 2d 440, 442 (Me. 1972). Although Maine's tax exemption statute was amended in 1953 to specify that the property need not be occupied by the charity to qualify for the exemption, but may also be "used solely" for its own purposes, see *ibid.*, this extension did not alter the "well defined rul[e] of exemption" permitting "occasional or purely incidental" renting. *Green Acre Baha'i Institute*, 150 Me., at 354, 110 A. 2d, at 584; see also *Alpha Rho Zeta of Lambda Chi Alpha, Inc.* v. *Waterville*, 477 A. 2d 1131, 1141 (Me. 1984). But cf. *Nature Conservancy of the Pine Tree State, Inc.* v. *Bristol*, 385 A. 2d 39, 43 (Me. 1978) (holding that requirement that property be used "solely" for institution's own purposes prohibits tax exemption where grantor of property to charity maintains private rights of use). Maine's statute expressly contemplates that entities receiving the benefit of the tax exemption may well earn profits, though of course these must be plowed back into the enterprise or otherwise appropriately used. See Me. Rev. Stat. Ann., Tit. 36, § 652(1)(C)(3) (Supp. 1996).

stitutions participate. Indeed, if we view the issue solely from the State's perspective, it is equally reasonable to use discriminatory tax exemptions as a means of encouraging the growth of local trade. But as our cases clearly hold, such exemptions are impermissible. See, *e. g., Bacchus Imports, Ltd.* v. *Dias,* 468 U. S. 263, 273 (1984). Protectionism, whether targeted at for-profit entities or serving, as here, to encourage nonprofits to keep their efforts close to home, is forbidden under the dormant Commerce Clause.[19]  If there is need for a special exception for nonprofits, Congress not only has the power to create it,[20] but also is in a far better position than we to determine its dimensions.[21]

## VI

Rather than urging us to create a categorical exception for nonprofit entities, the Town argues that Maine's exemption statute should be viewed as an expenditure of government money designed to lessen its social service burden and to foster the societal benefits provided by charitable organizations. So characterized, the Town submits that its tax exemption scheme is either a legitimate discriminatory subsidy

---

[19] Contrary to JUSTICE SCALIA's suggestion, nothing in our holding today "prevent[s] a State from giving a tax break to charities that benefit the State's inhabitants." *Post,* at 595. The States are, of course, free to provide generally applicable nondiscriminatory tax exemptions without running afoul of the dormant Commerce Clause.

[20] See n. 8, *supra.*

[21] We must admit to some puzzlement as to the force of the argument underlying JUSTICE SCALIA's dissent. On the one hand, he suggests that a categorical exemption of nonprofit activities from dormant Commerce Clause scrutiny would be proper. *Post,* at 607–608. Yet at the same time, he makes a great effort to characterize *this* statute as being so narrow that, whatever the appropriate generally applicable rule, the dormant Commerce Clause ought not to apply here. *Post,* at 598. As we have explained, the argument in favor of a *categorical* exemption for nonprofits is unpersuasive, and we disagree with JUSTICE SCALIA's characterization of this statute's effects. Accordingly, we reject his position on either of these theories.

of only those charities that choose to focus their activities on local concerns, or alternatively a governmental "purchase" of charitable services falling within the narrow exception to the dormant Commerce Clause for States in their role as "market participants," see, e. g., Hughes v. Alexandria Scrap Corp., 426 U. S. 794 (1976); Reeves, Inc. v. Stake, 447 U. S. 429 (1980). We find these arguments unpersuasive. Although tax exemptions and subsidies serve similar ends, they differ in important and relevant respects, and our cases have recognized these distinctions. As for the "market participant" argument, we have already rejected the Town's position in a prior case, and in any event respondents' open-ended exemption for charitable and benevolent institutions is not analogous to the industry-specific state actions that we reviewed in Alexandria Scrap and Reeves.

The Town argues that its discriminatory tax exemption is, in economic reality, no different from a discriminatory subsidy of those charities that cater principally to local needs. Noting our statement in West Lynn Creamery that "[a] pure subsidy funded out of general revenue ordinarily imposes no burden on interstate commerce, but merely assists local business," 512 U. S., at 199, the Town submits that since a discriminatory subsidy may be permissible, a discriminatory exemption must be, too. We have "never squarely confronted the constitutionality of subsidies," id., at 199, n. 15, and we need not address these questions today. Assuming, arguendo, that the Town is correct that a direct subsidy benefiting only those nonprofits serving principally Maine residents would be permissible, our cases do not sanction a tax exemption serving similar ends.[22]

---

[22] As the Supreme Judicial Court made clear, 655 A. 2d, at 878, under Maine law an exemption is categorized as a "tax expenditure." Me. Rev. Stat. Ann., Tit. 36, § 196 (1990). The Town's effort to argue that this state statutory categorization allows it to elide the federal constitutional distinction between tax exemptions and subsidies is unavailing. We recognized long ago that a tax exemption can be viewed as a form of government

In *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664 (1970), notwithstanding our assumption that a direct subsidy of religious activity would be invalid,[23] we held that New York's tax exemption for church property did not violate the Establishment Clause of the First Amendment.[24] That holding rested, in part, on the premise that there is a constitutionally significant difference between subsidies and tax exemptions.[25] We have expressly recognized that this distinction is also applicable to claims that certain state action designed to give residents an advantage in the marketplace is prohibited by the Commerce Clause.

In *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269 (1988), we found unconstitutional under the Commerce Clause an Ohio tax scheme that provided a sales tax credit for ethanol produced in State, or manufactured in another State to the extent that State gave similar tax advantages to ethanol produced in Ohio. We recognized that the party challenging the Ohio scheme was "eligible to receive a cash subsidy"

---

spending. See *Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540, 544 (1983). The distinction we have drawn for dormant Commerce Clause purposes does not turn on this point.

[23] We noted: "Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards, but that is not this case." *Walz*, 397 U. S., at 675.

[24] We reasoned that "New York's statute [cannot be read] as attempting to establish religion; it . . . simply spar[es] the exercise of religion from the burden of property taxation levied on private profit institutions." *Id.*, at 673.

[25] "The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state. No one has ever suggested that tax exemption has converted libraries, art galleries, or hospitals into arms of the state or put employees 'on the public payroll.'" *Id.*, at 675. As Justice Brennan noted: "Tax exemptions and general subsidies . . . are qualitatively different." *Id.*, at 690 (concurring opinion).

from its home State, and was therefore "the potential beneficiary of a scheme no less discriminatory than the one that it attacks, and no less effective in conferring a commercial advantage over out-of-state competitors." *Id.*, at 278. That was of no importance. We noted: "The Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that description *in connection with the State's regulation of interstate commerce.* Direct subsidization of domestic industry does not ordinarily run afoul of that prohibition; discriminatory taxation . . . does." *Ibid.* (emphasis in original). See also *West Lynn,* 512 U. S., at 210 (SCALIA, J., concurring in judgment) (drawing similar distinction between forbidden generally applicable tax with discriminatory "exemption" and permissible "subsidy . . . funded from the State's general revenues"). This distinction is supported by scholarly commentary as well as precedent, and we see no reason to depart from it. See Enrich, Saving the States from Themselves: Commerce Clause Constraints on State Tax Incentives for Business, 110 Harv. L. Rev. 377, 442–443 (1996); Hellerstein & Coenen, Commerce Clause Restraints on State Business Development Incentives, 81 Cornell L. Rev. 789, 846–848 (1996).[26] The Town's claim that its discriminatory tax scheme should be viewed as a permissible subsidy is therefore unpersuasive.[27]

---

[26] The distinction provides a sufficient response to the Town's argument that our ruling today would invalidate a State's subsidization of all or part of its residents' tuition at state-owned universities.

[27] JUSTICE SCALIA, *post,* at 605–606, and n. 4, would distinguish this line of authority by holding that it should not apply where a State is giving tax relief to charitable enterprises. As explained in Part V, *supra,* we see no categorical reason to treat for-profit and nonprofit entities differently under the dormant Commerce Clause. JUSTICE SCALIA's heavy reliance upon *Board of Ed. of Ky. Annual Conference of Methodist Episcopal Church* v. *Illinois,* 203 U. S. 553 (1906), is misplaced. In that case, a bequest to a Kentucky charitable corporation did not qualify for an exemp-

Finally, the Town argues that its discriminatory tax exemption scheme falls within the "market-participant" exception. As we explained in *New Energy Co.:* "That doctrine differentiates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant; only the former is subject to the limitations of the negative Commerce Clause." 486 U. S., at 277. See *White* v. *Massachusetts Council of Constr. Employers, Inc.,* 460 U. S. 204, 208 (1983); *Reeves, Inc.* v. *Stake,* 447 U. S., at 436–437; *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S., at 810.

In *Alexandria Scrap* we concluded that the State of Maryland had, in effect, entered the market for abandoned automobile hulks as a purchaser because it was using state funds to provide bounties for their removal from Maryland streets and junkyards. *Id.,* at 809–810. In *Reeves,* the State of South Dakota similarly participated in the market for cement as a seller of the output of the cement plant that it had owned and operated for many years. 447 U. S., at 431–432. And in *White,* the city of Boston had participated in the construction industry by funding certain projects. 460 U. S., at 205–206. These three cases stand for the proposition that, for purposes of analysis under the dormant Commerce Clause, a State acting in its proprietary capacity as a pur-

---

tion from the Illinois inheritance tax because the corporate legatee was not incorporated in Illinois. In this case, the petitioner is a Maine corporation, and the validity of the portion of the Maine statute that denies the exemption to out-of-state corporations is not at issue. Moreover, unlike the situation in *Board of Ed. of Ky.,* in which none of the charitable activities of the legatee were performed in Illinois, all of the benefits of attending petitioner's camp in Maine are "bestowed within her borders." *Id.,* at 563. While the dictum that JUSTICE SCALIA quotes, *post,* at 606, is consistent with his analysis, it does not purport to address the applicability of the dormant Commerce Clause to charities in general, to resident charities, or to nonresident charities that provide benefits for both residents and nonresidents.

chaser or seller may "favor its own citizens over others." *Alexandria Scrap*, 426 U. S., at 810.

Maine's tax exemption statute cannot be characterized as a proprietary activity falling within the market-participant exception. In *New Energy Co.*, Ohio argued similarly that a discriminatory tax credit program fell within the exception. We noted that the tax program had "the purpose and effect of subsidizing a particular industry, as do many dispositions of the tax laws." 486 U. S., at 277. "That," we explained, "does not transform it into a form of state participation in the free market." *Ibid.* "The Ohio action ultimately at issue is neither its purchase nor its sale of ethanol, but its assessment and computation of taxes—a primeval governmental activity." *Ibid.* As we indicated in *White:* "[I]n this kind of case there is 'a single inquiry: whether the challenged "program constituted direct state participation in the market."'" 460 U. S., at 208 (quoting *Reeves*, 447 U. S., at 436, n. 7). A tax exemption is not the sort of direct state involvement in the market that falls within the market-participation doctrine.

Even if we were prepared to expand the exception in the manner suggested by the Town, the Maine tax statute at issue here would be a poor candidate. Like the tax exemption upheld in *Walz*—which applied to libraries, art galleries, and hospitals as well as churches[28]—the exemption that has been denied to petitioner is available to a broad category of charitable and benevolent institutions.[29] For that reason, nothing short of a dramatic expansion of the "market-

---

[28] See *Walz,* 397 U. S., at 666–667, and n. 1.

[29] See Me. Rev. Stat. Ann., Tit. 36, § 652(1)(A) (Supp. 1996) ("For the purposes of this paragraph, 'benevolent and charitable institutions' *include, but are not limited to,* nonprofit nursing homes and nonprofit boarding homes and boarding care facilities . . . , nonprofit community mental health service facilities . . . [,] and nonprofit child care centers") (emphasis added).

participant" exception would support its application to this case. *Alexandria Scrap* involved Maryland's entry into the market for automobile hulks, a discrete activity focused on a single industry. Similarly, South Dakota's participation in the market for cement was—in part because of its narrow scope—readily conceived as a proprietary action of the State. In contrast, Maine's tax exemption—which sweeps to cover broad swathes of the nonprofit sector—must be viewed as action taken in the State's sovereign capacity rather than a proprietary decision to make an entry into all of the markets in which the exempted charities function. See *White*, 460 U. S., at 211, n. 7 (noting that "there are some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business"). The Town's version of the "market-participant" exception would swallow the rule against discriminatory tax schemes. Contrary to the Town's submission, the notion that whenever a State provides a discriminatory tax abatement it is "purchasing" some service in its proprietary capacity is not readily confined to the charitable context. A special tax concession for liquors indigenous to Hawaii, for example, might be conceived as a "purchase" of the jobs produced by local industry, or an investment in the unique local cultural value provided by these beverages. Cf. *Bacchus*, 468 U. S., at 270–271. Discriminatory schemes favoring local farmers might be seen as the "purchase" of agricultural services in order to ensure that the State's citizens will have a steady local supply of the product. Cf. *West Lynn*, 512 U. S., at 190 (striking down statute protecting in-state milk producers designed to "preserve . . . local industry," "thereby ensur[ing] a continuous and adequate supply of fresh milk for our market" (internal quotation marks omitted)). Our cases provide no support for the Town's radical effort to expand the market-participant doctrine.

## VII

As was true in *Bacchus Imports, Ltd.* v. *Dias*, the facts of this particular case, viewed in isolation, do not appear to pose any threat to the health of the national economy. Nevertheless, history, including the history of commercial conflict that preceded the Constitutional Convention as well as the uniform course of Commerce Clause jurisprudence animated and enlightened by that early history, provides the context in which each individual controversy must be judged. The history of our Commerce Clause jurisprudence has shown that even the smallest scale discrimination can interfere with the project of our Federal Union. As Justice Cardozo recognized, to countenance discrimination of the sort that Maine's statute represents would invite significant inroads on our "national solidarity":

> "The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 523 (1935).

The judgment of the Maine Supreme Judicial Court is reversed.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE GINSBURG join, dissenting.

The Court's negative Commerce Clause jurisprudence has drifted far from its moorings. Originally designed to create a national market for commercial activity, it is today invoked to prevent a State from giving a tax break to charities that benefit the State's inhabitants. In my view, Maine's tax exemption, which excuses from taxation only that property

used to relieve the State of its burden of caring for its residents, survives even our most demanding Commerce Clause scrutiny.

I

We have often said that the purpose of our negative Commerce Clause jurisprudence is to create a national market. As Justice Jackson once observed, the "vision of the Founders" was "that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them." *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 539 (1949). In our zeal to advance this policy, however, we must take care not to overstep our mandate, for the Commerce Clause was not intended "to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Huron Portland Cement Co.* v. *Detroit*, 362 U. S. 440, 443–444 (1960).

Our cases have struggled (to put it nicely) to develop a set of rules by which we may preserve a national market without needlessly intruding upon the States' police powers, each exercise of which no doubt has some effect on the commerce of the Nation. See *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S. 175, 180–183 (1995). The rules that we currently use can be simply stated, if not simply applied: Where a state law facially discriminates against interstate commerce, we observe what has sometimes been referred to as a "virtually *per se* rule of invalidity;" where, on the other hand, a state law is nondiscriminatory, but nonetheless adversely affects interstate commerce, we employ a deferential "balancing test," under which the law will be sustained unless "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits," *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970). See *Oregon*

*Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.*, 511 U. S. 93, 99 (1994).

While the "virtually *per se* rule of invalidity" entails application of the "strictest scrutiny," *Hughes* v. *Oklahoma,* 441 U. S. 322, 337 (1979), it does not necessarily result in the invalidation of facially discriminatory state legislation, see, *e. g., Maine* v. *Taylor,* 477 U. S. 131 (1986) (upholding absolute ban on the importation of baitfish into Maine), for "what may appear to be a 'discriminatory' provision in the constitutionally prohibited sense—that is, a protectionist enactment—may on closer analysis not be so," *New Energy Co. of Ind.* v. *Limbach,* 486 U. S. 269, 278 (1988). Thus, even a statute that erects an absolute barrier to the movement of goods across state lines will be upheld if "the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism," *id.,* at 274, or to put a finer point on it, if the state law "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives," *id.,* at 278.

In addition to laws that employ suspect means as a necessary expedient to the advancement of legitimate state ends, we have also preserved from judicial invalidation laws that confer advantages upon the State's residents but do so without *regulating* interstate commerce. We have therefore excepted the State from scrutiny when it participates in markets rather than regulates them—by selling cement, for example, see *Reeves, Inc.* v. *Stake,* 447 U. S. 429 (1980), or purchasing auto hulks, see *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794 (1976), or hiring contractors, see *White* v. *Massachusetts Council of Constr. Employers, Inc.,* 460 U. S. 204 (1983). Likewise, we have said that direct subsidies to domestic industry do not run afoul of the Commerce Clause. See *New Energy Co., supra,* at 278. In sum, we have declared that "[t]he Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that description *in con-*

*nection with the State's regulation of interstate commerce."*
*Ibid.* (emphasis in original).

## II

In applying the foregoing principles to the case before us, it is of course important to understand the precise scope of the exemption created by Me. Rev. Stat. Ann., Tit. 36, § 652(1)(A) (Supp. 1996–1997). The Court's analysis suffers from the misapprehension that § 652(1)(A) "sweeps to cover broad swathes of the nonprofit sector," *ante,* at 594, including nonprofit corporations engaged in quintessentially commercial activities. That is not so. A review of Maine law demonstrates that the provision at issue here is a narrow tax exemption, designed merely to compensate or subsidize those organizations that contribute to the public fisc by dispensing public benefits the State might otherwise provide.

Although Maine allows nonprofit corporations to be organized "for any lawful purpose," Me. Rev. Stat. Ann., Tit. 13–B, § 201 (1981 and Supp. 1996–1997), the exemption supplied by § 652(1)(A) does not extend to all nonprofit organizations, but only to those "benevolent and charitable institutions," § 652(1)(A), which are "organized and conducted *exclusively* for benevolent and charitable purposes," § 652(1)(C)(1) (emphasis added), and only to those parcels of real property and items of personal property that are used "solely," § 652(1)(A), "to further the organization's charitable purposes," *Poland* v. *Poland Springs Health Institute, Inc.,* 649 A. 2d 1098, 1100 (Me. 1994). The Maine Supreme Judicial Court has defined the statutory term "benevolent and charitable institutions" to include only those nonprofits that dispense "charity," which is in turn defined to include only those acts which are

> "'for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them

to establish themselves in life, or by erecting or maintaining public buildings or works *or otherwise lessening the burdens of government.'* " *Lewiston* v. *Marcotte Congregate Housing, Inc.*, 673 A. 2d 209, 211 (1996) (emphasis added).

Moreover, the Maine Supreme Judicial Court has further limited the §652(1)(A) exemption by insisting that the party claiming its benefit "bring its claim unmistakably within the spirit and intent of the act creating the exemption," *ibid.* (internal quotation marks omitted), and by proclaiming that the spirit and intent of §652(1)(A) is to compensate charitable organizations for their contribution to the public fisc.   As the court has explained:

> " '[A]ny institution which by its charitable activities relieves the government of part of [its] burden is conferring a pecuniary benefit upon the body politic, and in receiving exemption from taxation it is merely being given a *"quid pro quo"* for its services in providing something which otherwise the government would have to provide.' " *Episcopal Camp Foundation, Inc.* v. *Hope*, 666 A. 2d 108, 110 (1995) (quoting *Young Men's Christian Assn. of Germantown* v. *Philadelphia*, 323 Pa. 401, 413, 187 A. 204, 210 (1936)).

Thus, §652(1)(A) exemptions have been denied to organizations that do not provide substantial public benefits, as defined by reference to the state public policy.   In one case, for example, an organization devoted to maintaining a wildlife sanctuary was denied exemption on the ground that the preserve's prohibition on deer hunting conflicted with state policy on game management, so that the preserve could not be deemed to provide a public benefit.   See *Holbrook Island Sanctuary* v. *Brooksville*, 214 A. 2d 660 (Me. 1965).   Even churches have been denied exemptions, see *Pentecostal Assembly of Bangor* v. *Maidlow*, 414 A. 2d 891, 893–894

(Me. 1980) ("religious purposes are not to be equated with benevolent and charitable purposes").

The Maine Supreme Judicial Court has adhered rigorously to the requirement that the exempt property be used "solely" for charitable purposes. Even when there is no question that the organization owning the property is devoted exclusively to charitable purposes, the entire exemption will be forfeited if even a small fraction of the property is not used in furtherance of those purposes. See *Lewiston, supra,* at 212–213 (denying exemption to a building 18 percent of which was leased at market rates); *Nature Conservancy of Pine Tree State, Inc.* v. *Bristol,* 385 A. 2d 39, 43 (1978) (denying exemption to a nature preserve on which the grantors had reserved rights-of-way).

That § 652(1)(A) serves to compensate private charities for helping to relieve the State of its burden of caring for its residents should not be obscured by the fact that this particular case involves a summer camp rather than a more traditional form of social service. The statute that the Court strikes down does not speak of "camps" at all, but rather lists as examples of "benevolent and charitable institutions" nonprofit nursing homes, boarding homes, community mental health service facilities, and child care centers, see § 652(1)(A). *Some* summer camps fall within the exemption under a 1933 decision of the Supreme Judicial Court which applied it to a *tuition-free* camp for *indigent* children, see *Camp Emoh Associates* v. *Inhabitants of Lyman,* 166 A. 59, 60, and under a recent 4-to-3 decision which relied heavily on the fact that the camp at issue provided "moral instruction" and training in "social living and civic responsibility," and was not only "nonprofit" but furnished its camping services *below cost,* see *Episcopal Camp Foundation, supra,* at 109, 111. What is at issue in this case is not whether a summer camp can properly be regarded as relieving the State of social costs, but rather whether, *assuming it can,* a distinction between charities serving mainly residents and

charities operated principally for the benefit of nonresidents is constitutional.[1]

## III

I turn next to the validity of this focused tax exemption—applicable only to property used solely for charitable purposes by organizations devoted exclusively to charity—under the negative Commerce Clause principles discussed earlier. The Court readily concludes that, by limiting the class of eligible property to that which is used "principally for the benefit of persons who are Maine residents," the statute "facially discriminates" against interstate commerce. That seems to me not necessarily true. Disparate treatment constitutes discrimination only if the objects of the disparate treatment are, for the relevant purposes, similarly situated. See *General Motors Corp.* v. *Tracy,* 519 U. S. 278, 298–299

---

[1] The Court protests that "there is no '*de minimis*' defense to a charge of discriminatory taxation under the Commerce Clause," *ante,* at 581, n. 15—as though that were the point of our emphasizing in this Part II the narrowness of the challenged limitation. It is not. Rather, the point is (1) that Maine's limitation focuses upon a particular state interest that is deserving of exemption from negative Commerce Clause invalidation, and (2) that acknowledging the principle of such an exemption (as developed in Part III below) will not place the "national market" in any peril. What the Court should have gleaned from our discussion, it did not: It persists in misdescribing the exemption we defend as "a categorical exemption of nonprofit activities from dormant Commerce Clause scrutiny." *Ante,* at 588, n. 21; see also *ante,* at 591–592, n. 27.

The Court also makes an attempt to contest on the merits the narrowness of the exemption, suggesting a massive effect upon interstate commerce by reciting the multi-billion-dollar annual revenues of nonprofit nursing homes, child care centers, hospitals, and health maintenance organizations. See *ante,* at 586–587, n. 18. But of course most of the services provided by those institutions are provided locally, to local beneficiaries. (In that regard the summer camp that is the subject of the present suit is most atypical.) The record does not show the number of nonprofit nursing homes, child care centers, hospitals, and HMO's in Maine that have been denied the charitable exemption because their property is not used "principally for the benefit of persons who are Maine residents"; but it would be a good bet that the number is zero.

(1997). And for purposes of entitlement to a tax subsidy from the State, it is certainly reasonable to think that property gratuitously devoted to relieving the State of some of its welfare burden is not similarly situated to property used "principally for the benefit of persons who are not residents of [the State]," § 652(1)(A). As we have seen, the theory underlying the exemption is that it is a *quid pro quo* for uncompensated expenditures that lessen the State's burden of providing assistance to its residents.

The Court seeks to establish "facial discrimination" by showing that the effect of treating disparate property disparately is to produce higher costs for those users of the property who come from out of State. But that could be regarded as an *indirect* effect upon interstate commerce produced by a tax scheme that is *not* facially discriminatory, which means that the proper mode of analysis would be the more lenient "balancing" standard discussed above. We follow precisely this mode of analysis in *Tracy*, upholding an Ohio law that provides preferential tax treatment to domestic public utilities. Such entities, we conclude, are not "similarly situated" to other fuel distributors; their insulation from out-of-state competition does not violate the negative Commerce Clause because it "serves important interests in health and safety." 519 U. S., at 306. The Court in *Tracy* paints a compelling image of people shivering in their homes in the dead of winter without the assured service that competition-sheltered public utilities provide. See *id.*, at 301–302, 306. No less important, however, is the availability of many of the benefits provided by Maine's private charities and facilitated not by total insulation from competition but by favorable tax treatment: care for the sick and dying, for example, or nursing services for the elderly.

Even if, however, the Maine statute displays "facial discrimination" against interstate commerce, that is not the end of the analysis. The most remarkable thing about today's judgment is that it is rendered without inquiry into whether the purposes of the tax exemption *justify* its favoritism.

Once having concluded that the statute is facially discriminatory, the Court rests. "[T]he Town," it asserts, "has made no effort to defend the statute under the *per se* rule." *Ante,* at 582. This seems to me a pointless technicality. The town of Harrison (Town) has asserted that the State's interest in encouraging private entities to shoulder part of its social-welfare burden validates this provision under the negative Commerce Clause. Whether it does so because the presence of that interest causes the resident-benefiting charities not to be "similarly situated" to the non-resident-benefiting charities, and hence *negates* "facial discrimination," or rather because the presence of that interest *justifies* "facial discrimination," is a question that is not only of no consequence but is also probably unanswerable. To strike down this statute because the Town's lawyers put the argument in one form rather than the other is truly senseless.[2]

If the Court were to proceed with that further analysis it would have to conclude, in my view, that this is one of those cases in which the "virtually *per se* rule of invalidity" does not apply. Facially discriminatory or not, the exemption is no more an artifice of economic protectionism than any state law which dispenses public assistance only to the State's residents.[3] Our cases have always recognized the legitimacy of

---

[2] I do not understand the Court's contention, *ante,* at 582, and n. 16, that *Fulton Corp.* v. *Faulkner,* 516 U. S. 325 (1996), provides precedent for such a course. In *Fulton,* the arguments left unaddressed had not been made in another form, but had not been made *at all.* There (unlike here) the State *conceded* facial discrimination, and relied exclusively on the compensatory tax defense, see *id.,* at 333, which the Court found had not been made out, see *id.,* at 344. That narrow defense could not possibly have been regarded as an invocation of broader policy justifications such as those asserted here.

[3] In a footnote responding to this dissent, the Court does briefly address whether the statute fails the "virtually *per se* rule of invalidity." It concludes that it does fail because "Maine has ample alternatives short of a facially discriminatory property tax exemption," such as offering direct cash subsidies to parents of resident children or to camps that serve residents. *Ante,* at 582, n. 16. These are *nonregulatory* alternatives (and hence immune from negative Commerce Clause attack), but they are not

limiting state-provided welfare benefits to bona fide residents. As JUSTICE STEVENS once wrote for a unanimous Court: "Neither the overnight visitor, the unfriendly agent of a hostile power, the resident diplomat, nor the illegal entrant, can advance even a colorable claim to a share in the bounty that a conscientious sovereign makes available to its own citizens." *Mathews* v. *Diaz,* 426 U. S. 67, 80 (1976). States have restricted public assistance to their own bona fide residents since colonial times, see, M. Ierley, With Charity For All, Welfare and Society, Ancient Times to the Present 41 (1984), and such self-interested behavior (or, put more benignly, application of the principle that charity begins at home) is inherent in the very structure of our federal system, cf. *Edgar* v. *MITE Corp.,* 457 U. S. 624, 644 (1982) ("[T]he State has no legitimate interest in protecting nonresident[s]"). We have therefore upheld against equal protection challenge continuing residency requirements for municipal employment, see *McCarthy* v. *Philadelphia Civil Serv. Comm'n,* 424 U. S. 645 (1976) *(per curiam),* and bona fide

---

*nondiscriminatory* alternatives, which is what the exception to the "virtually *per se* rule of invalidity" requires. See *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.,* 511 U. S. 93, 101 (1994) (quoting *New Energy Co. of Ind.* v. *Limbach,* 486 U. S. 269, 278 (1988)). Surely, for example, our decision in *Maine* v. *Taylor,* 477 U. S. 131 (1986), which upheld Maine's regulatory ban on the importation of baitfish, would not have come out the other way if it had been shown that a state *subsidy* of sales of in-state baitfish could have achieved the same goal—by making the out-of-state fish noncompetitive and thereby excluding them from the market even more effectively than a difficult-to-police ban on importation. Where regulatory discrimination against out-of-state interests is appropriate, the negative Commerce Clause is not designed to push a State into nonregulatory discrimination instead. It permits state regulatory action disfavoring out-of-staters where disfavoring them is indispensable to the achievement of an important and nonprotectionist state objective. As applied to the present case: It is obviously impossible for a State to distribute social welfare benefits only to its residents without discriminating against nonresidents.

residency requirements for free primary and secondary schooling, see *Martinez* v. *Bynum*, 461 U. S. 321 (1983).

If the negative Commerce Clause requires the invalidation of a law such as § 652(1)(A), as a logical matter it also requires invalidation of the laws involved in those cases. After all, the Court today relies not on any discrimination against out-of-state nonprofits, but on the supposed discrimination against nonresident would-be *recipients* of charity (the nonprofits' "customers"); surely those individuals are similarly discriminated against in the direct distribution of state benefits. The problem, of course, is not limited to municipal employment and free public schooling, but extends also to libraries, orphanages, homeless shelters, and refuges for battered women. One could hardly explain the constitutionality of a State's limiting its provision of these to its own residents on the theory that the State is a "market participant." These are traditional governmental functions, far removed from commercial activity and utterly unconnected to any genuine private market.

If, however, a State that provides social services directly *may* limit its largesse to its own residents, I see no reason why a State that chooses to provide some of its social services indirectly—by compensating or subsidizing private charitable providers—cannot be similarly restrictive.[4] In fact, we have already approved it. In *Board of Ed. of Ky. Annual Conference of Methodist Episcopal Church* v. *Illinois*, 203 U. S. 553 (1906), we upheld a state law providing an in-

---

[4] It is true, of course, that the legitimacy of a State's subsidizing domestic commercial enterprises out of general funds does not establish the legitimacy of a State's giving domestic commercial enterprises preferential tax treatment. See *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 210–212 (1994) (SCALIA, J., concurring in judgment). But there is no valid comparison between, on the one hand, the State's giving tax relief to an enterprise devoted to the making of profit and, on the other hand, the State's giving tax relief to an enterprise which, for the purpose at hand, has the same objective as the State itself (the expenditure of funds for social welfare).

heritance tax exemption to in-state charities but denying a similar exemption to out-of-state charities. We recognized that such exemptions are nothing but compensation to private organizations for their assistance in alleviating the State's burden of caring for its less fortunate residents, see *id.*, at 561. "[I]t cannot be said," we wrote, "that if a State exempts property bequeathed for charitable or educational purposes from taxation it is unreasonable or arbitrary to require the charity to be exercised or the education to be bestowed within her borders and for her people," *id.*, at 563.[5]

It is true that the opinion in *Board of Ed. of Ky.* addressed only the Equal Protection and Privileges and Immunities Clauses of the Fourteenth Amendment, and not the Commerce Clause. A Commerce Clause argument was unquestionably raised by the plaintiff in error, however, in both brief, see Brief for Plaintiff in Error, D. T. 1906, No. 103, pp. 30–38, and oral argument, see 203 U. S., at 555 (argument of counsel), and the Court could not have reached the disposition it did without rejecting it. "[T]he Court implicitly rejected [the] argumen[t] . . . by refusing to address [it]." *Clemons* v. *Mississippi,* 494 U. S. 738, 747–748, n. 3 (1990). The Commerce Clause objection went undiscussed, I think, because it was (as it is here) utterly contrived: The State's

---

[5] The Court attempts to distinguish *Board of Ed. of Ky.* on the ground that the statute upheld in that case treated charities differently based on whether they were incorporated within the State, rather than on whether they dispensed charity within the State, see *ante,* at 591–592, n. 27. That is quite impossible, inasmuch as we have *held* that out-of-state incorporation is *not* a constitutional basis for discriminating between charities. And in the case that announced that holding (invalidating the denial of a property tax exemption to a nonprofit corporation incorporated in another State), we distinguished *Board of Ed. of Ky.* on the ground that the statute at issue there withheld the exemption "by reason of the foreign corporation's failure or inability to benefit the State in the same measure as do domestic nonprofit corporations." *WHYY, Inc.* v. *Glassboro,* 393 U. S. 117, 120 (1968) *(per curiam).* The Court's analysis contradicts both the holding of this case and its reading of *Board of Ed. of Ky.*—which is obviously the correct one.

legislated distinction between charity "bestowed within her borders and for her people" and charity bestowed elsewhere or for others did not implicate commerce at all, except to the indirect and permissible extent that innumerable state laws do.

Finally, even if Maine's property tax exemption for local charities constituted facial discrimination against out-of-state commerce, and even if its policy justification (unrelated to economic protectionism) were insufficient to survive our "virtually *per se* rule of invalidity," cf. *Maine* v. *Taylor*, 477 U. S. 131 (1986), there would remain the question whether we should not recognize an additional exception to the negative Commerce Clause, as we have in *Tracy*. As that case explains, just as a public health justification unrelated to economic protectionism may justify an overt discrimination against goods moving in interstate commerce, "so may health and safety considerations be weighed in the process of deciding the threshold question whether the conditions entailing application of the dormant Commerce Clause are present." 519 U. S., at 307. Today's opinion goes to great length to reject the Town's contention that Maine's property tax exemption does not fall squarely within either the "market participant" or "subsidy" exceptions to the negative Commerce Clause, but never stops to ask whether those exceptions are the only ones that may apply. As we explicitly acknowledge in *Tracy*—which effectively creates what might be called a "public utilities" exception to the negative Commerce Clause—the "subsidy" and "market participant" exceptions do not exhaust the realm of state actions that we should abstain from scrutinizing under the Commerce Clause. In my view, the provision by a State of free public schooling, public assistance, and other forms of social welfare to only (or principally) its own residents—whether it be accomplished directly or by providing tax exemptions, cash, or other property to private organizations that perform the work for the State—implicates none of the concerns underlying our

negative Commerce Clause jurisprudence. That is, I think, self-evidently true, despite the Court's effort to label the recipients of the State's philanthropy as "customers," or "clientele," see, *e. g., ante,* at 576. Because § 652(1)(A) clearly serves these purposes and has nothing to do with economic protectionism, I believe that it is beyond scrutiny under the negative Commerce Clause.

\* \* \*

As I have discussed, there are various routes by which the Court could validate the statute at issue here: on the ground that it does not constitute "facial discrimination" against interstate commerce and readily survives the *Pike* v. *Bruce Church* balancing test; on the ground that it does constitute "facial discrimination" but is supported by such traditional and important state interests that it survives scrutiny under the "virtually *per se* rule of invalidity"; or on the ground that there is a "domestic charity" exception (just as there is a "public utility" exception) to the negative Commerce Clause. Whichever route is selected, it seems to me that the *quid pro quo* exemption at issue here is such a reasonable exercise of the State's taxing power that it is not prohibited by the Commerce Clause in the absence of congressional action. We held as much in *Board of Ed. of Ky.* and should not overrule that decision.

The State of Maine may have special need for a charitable-exemption limitation of the sort at issue here: Its lands and lakes are attractive to various charities of more densely populated Eastern States, which would (if the limitation did not exist) compel the taxpayers of Maine to subsidize their generosity. But the principle involved in our disapproval of Maine's exemption limitation has broad application elsewhere. A State will be unable, for example, to exempt private schools that serve its citizens from state and local real estate taxes unless it exempts as well private schools attended predominantly or entirely by students from

out of State. A State that provides a tax exemption for real property used exclusively for the purpose of feeding the poor must provide an exemption for the facilities of an organization devoted exclusively to feeding the poor in another country. These results may well be in accord with the parable of the Good Samaritan, but they have nothing to do with the Commerce Clause.

I respectfully dissent.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, and with whom THE CHIEF JUSTICE joins as to Part I, dissenting.

The tax at issue here is a tax on real estate, the quintessential asset that does not move in interstate commerce. Maine exempts from its otherwise generally applicable property tax, and thereby subsidizes, certain charitable organizations that provide the bulk of their charity to Maine's own residents. By invalidating Maine's tax assessment on the real property of charitable organizations primarily serving non-Maine residents, because of the tax's alleged *indirect* effect on interstate commerce, the majority has essentially created a "dormant" Necessary and Proper Clause to supplement the "dormant" Commerce Clause. This move works a significant, unwarranted, and, in my view, improvident expansion in our "dormant," or "negative," Commerce Clause jurisprudence.[1] For that reason, I join JUSTICE SCALIA's dissenting opinion.

---

[1] Although the terms "dormant" and "negative" have often been used interchangeably to describe our jurisprudence in this area, I believe "negative" is the more appropriate term. See *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S. 175, 200 (1995) (SCALIA, J., joined by THOMAS, J., concurring in judgment) ("[T]he 'negative Commerce Clause' . . . is 'negative' not only because it negates state regulation of commerce, but also because it does *not* appear in the Constitution"). There is, quite frankly, nothing "dormant" about our jurisprudence in this area. See Eule, Laying the Dormant Commerce Clause to Rest, 91 Yale L. J. 425, 425, n. 1 (1982).

I write separately, however, because I believe that the improper expansion undertaken today is possible only because our negative Commerce Clause jurisprudence, developed primarily to invalidate discriminatory state taxation of interstate commerce, was already both overbroad and unnecessary. It was overbroad because, unmoored from any constitutional text, it brought within the supervisory authority of the federal courts state action far afield from the discriminatory taxes it was primarily designed to check. It was unnecessary because the Constitution would seem to provide an *express* check on the States' power to levy certain discriminatory taxes on the commerce of other States—not in the judicially created negative Commerce Clause, but in the Art. I, § 10, Import-Export Clause, our decision in *Woodruff* v. *Parham*, 8 Wall. 123 (1869), notwithstanding. That the expansion effected by today's decision finds some support in the morass of our negative Commerce Clause case law only serves to highlight the need to abandon that failed jurisprudence and to consider restoring the original Import-Export Clause check on discriminatory state taxation to what appears to be its proper role. As I explain in Part III, the tax (and tax exemption) at issue in this case seems easily to survive Import-Export Clause scrutiny; I would therefore, in all likelihood, sustain Maine's tax under that Clause as well, were we to apply it instead of the judicially created negative Commerce Clause.

I

The negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application. See, *e. g., Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 259–265 (1987) (SCALIA, J., dissenting); *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.*, 486 U. S. 888, 895–898 (1988) (SCALIA, J., concurring in judgment). In one fashion

or another, every Member of the current Court[2] and a goodly number of our predecessors[3] have at least recognized these problems, if not been troubled by them.[4]  Because the

---

[2] See, e. g., C & A Carbone, Inc. v. Clarkstown, 511 U. S. 383, 401 (1994) (O'CONNOR, J., concurring in judgment) ("The scope of the dormant Commerce Clause is a judicial creation"); Quill Corp. v. North Dakota, 504 U. S. 298, 309 (1992) (STEVENS, J., writing for a unanimous Court) (recognizing that the Commerce Clause "says nothing about the protection of interstate commerce in the absence of any action by Congress"); Wyoming v. Oklahoma, 502 U. S. 437, 461–462 (1992) (SCALIA, J., joined by REHNQUIST, C. J., and THOMAS, J., dissenting) (describing the "negative Commerce Clause" as "nontextual"); Kassel v. Consolidated Freightways Corp. of Del., 450 U. S. 662, 706 (1981) (REHNQUIST, J., dissenting) ("[T]he jurisprudence of the 'negative side' of the Commerce Clause remains hopelessly confused"); cf. U. S. Term Limits, Inc. v. Thornton, 514 U. S. 779, 797, n. 12 (1995) (STEVENS, J., joined by KENNEDY, SOUTER, GINSBURG, and BREYER, JJ.) ("[T]he Constitution is clearly silent on the subject of state legislation that discriminates against interstate commerce").

[3] See, e. g., Wardair Canada Inc. v. Florida Dept. of Revenue, 477 U. S. 1, 17 (1986) (Burger, C. J., concurring in part and concurring in judgment) (referring to "the cloudy waters of this Court's 'dormant Commerce Clause' doctrine"); Philadelphia v. New Jersey, 437 U. S. 617, 623 (1978) (Stewart, J.) ("The bounds of [the restraints imposed by the Commerce Clause itself, in the absence of federal legislation], appear nowhere in the words of the Commerce Clause"); Northwestern States Portland Cement Co. v. Minnesota, 358 U. S. 450, 457, 458 (1959) (Clark, J.) (referring to our negative Commerce Clause jurisprudence as a "tangled underbrush" and a "quagmire" (internal quotation marks omitted)); H. P. Hood & Sons, Inc. v. Du Mond, 336 U. S. 525, 534–535 (1949) (Jackson, J.) (describing the negative Commerce Clause as filling in one of the "great silences of the Constitution"); McCarroll v. Dixie Greyhound Lines, Inc., 309 U. S. 176, 189 (1940) (Black, J., joined by Frankfurter and Douglas, JJ., dissenting) (criticizing the negative Commerce Clause as arising out of "[s]pasmodic and unrelated instances of litigation [that] cannot afford an adequate basis for the creation of integrated national rules" that "Congress alone" is positioned to develop).

[4] Scholarly commentary, too, has been critical of our negative Commerce Clause jurisprudence.  See D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, p. 234 (1985) (describing the negative Commerce Clause as "arbitrary, conclusory, and irreconcilable with the constitutional text"); see also, e. g., L. Tribe, American Constitu-

expansion effected by today's holding further undermines the delicate balance in what we have termed "Our Federalism," *Younger* v. *Harris*, 401 U. S. 37, 44 (1971), I think it worth revisiting the underlying justifications for our involvement in the negative aspects of the Commerce Clause, and the compelling arguments demonstrating why those justifications are illusory.

To cover its exercise of judicial power in an area for which there is no textual basis, the Court has historically offered two different theories in support of its negative Commerce Clause jurisprudence. The first theory posited was that the Commerce Clause itself constituted an *exclusive* grant of power to Congress. See, *e. g.*, *Passenger Cases*, 7 How. 283, 393–400 (1849).[5] The "exclusivity" rationale was likely wrong from the outset, however. See, *e. g.*, The Federalist No. 32, p. 154 (M. Beloff ed. 1987) (A. Hamilton) ("[N]otwithstanding the affirmative grants of general authorities, there has been the most pointed care in those cases where it was deemed improper that the like authorities should reside in the states, to insert negative clauses prohibiting the exercise

---

tional Law 439 (2d ed. 1988) ("The Supreme Court's approach to commerce clause issues . . . often appears to turn more on *ad hoc* reactions to particular cases than on any consistent application of coherent principles"); Redish & Nugent, "The Dormant Commerce Clause and the Constitutional Balance of Federalism," 1987 Duke L. J. 569, 573 ("[N]ot only is there no textual basis [for it], the dormant Commerce Clause actually contradicts, and therefore directly undermines, the Constitution's carefully established textual structure for allocating power between federal and state sovereigns"); B. Gavit, The Commerce Clause of the United States Constitution 22 (1932) (noting that the Court has set "no conscious standard" but has rather, "in an imperial way," decided whether each particular state action presented to it "was or was not an invalid regulation of interstate commerce").

[5] See also *Mayor of New York* v. *Miln*, 11 Pet. 102, 157–159 (1837) (Story, J., dissenting); *Groves* v. *Slaughter*, 15 Pet. 449, 504, 506–508 (1841) (McLean, J., concurring); *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299 (1852) (adopting a partial-exclusivity rationale for dormant Commerce Clause cases).

of them by the states").[6]   It was seriously questioned even in early cases.   See *License Cases*, 5 How. 504, 583, 615, 618, 624 (1847) (four, and arguably five, of the seven participating Justices contending that the Commerce Clause was not exclusive).   And, in any event, the Court has long since "repudiated" the notion that the Commerce Clause operates as an exclusive grant of power to Congress, and thereby forecloses state action respecting interstate commerce.   *Freeman* v. *Hewit*, 329 U. S. 249, 259, 262 (1946) (Rutledge, J., concurring); see also, *e. g.*, *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 766–767 (1945) ("Ever since *Willson* v. *Black-Bird Creek Marsh Co.*, 2 Pet. 245, and *Cooley* v. *Board of Wardens*, 12 How. 299, it has been recognized that, in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it"); *James* v. *Watt*, 716 F. 2d 71, 73 (CA1 1983) (Breyer, J.) (noting that "the strong Madison/Marshall 'preemptive' view of the Interstate Commerce Clause is no longer the law of the land"), cert. denied, 467 U. S. 1209 (1984).[7]

---

[6] See also F. Frankfurter, The Commerce Clause Under Marshall, Taney and Waite 13 (1937) ("The conception that the mere grant of the commerce power to Congress dislodged state power finds no expression" in the records of the Philadelphia Convention nor the discussions preceding ratification); *id.*, at 17–19 (noting that Chief Justice Marshall's discussion of the "exclusiveness" doctrine in *Gibbons* v. *Ogden*, 9 Wheat. 1, 197–209 (1824), "was logically irrelevant to [his] holding," and adding: "It was an audacious doctrine, which, one may be sure, would hardly have been publicly avowed in support of the adoption of the Constitution.   Indeed, *The Federalist* in effect denied it, by assuring that only express prohibitions in the Constitution limited the taxing power of the states" (citing The Federalist No. 32)).

[7] The majority's assertion that James Madison viewed what we have termed the "negative" aspect of the Commerce Clause as more significant than its positive aspects, see *ante*, at 571, n. 7, is based on a letter written by Madison more than 40 years after the Convention, see 3 The Records of the Federal Convention of 1787, p. 478 (M. Farrand ed. 1911) (hereinafter Farrand) (reprinting letter from James Madison to J. C. Cabell, Feb. 13,

Indeed, the Court's early view that the Commerce Clause, on its own, prohibited state impediments to interstate commerce such that "Congress cannot re-grant, or in any manner reconvey to the states that power," *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299, 318 (1852), quickly proved untenable. Compare *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 13 How. 518 (1852) (holding that construction of the Wheeling Bridge impeded commerce in violation of the Commerce Clause), with *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421, 426 (1856) (upholding Federal Act that declared the Wheeling Bridge to be "[a] lawful structur[e]"); see also *Transportation Co.* v. *Parkersburg*, 107 U. S. 691, 701 (1883) ("It is Congress, and not the Judicial Department, to which the Constitution has given the power to regulate commerce").[8] And, as this Court's definition of the scope of congressional authority under the positive Commerce Clause has expanded, the exclusivity rationale has moved from untenable to absurd.

The second theory offered to justify creation of a negative Commerce Clause is that Congress, by its silence, pre-empts state legislation. See *Robbins* v. *Shelby County Taxing Dist.*, 120 U. S. 489, 493 (1887) (asserting that congressional

---

1829). The majority's interpretation of the letter is anachronistic. There is nothing in the letter to suggest that Madison had in mind the "negative" Commerce Clause we have created which supposedly operates of its own force to allow *courts* to invalidate state laws that affect commerce. Rather, Madison's reference to the Clause as granting a "power" strongly suggests that he was merely asserting that the Convention designed the Clause more to enable "the General Government," namely, *Congress*, to *negate* state laws impeding commerce "rather than as a power to be used for the positive purposes of the General Government." *Ibid.*

[8] See also *ante*, at 572 ("Congress unquestionably has the power to repudiate or substantially modify th[e] course of [our negative Commerce Clause] adjudication"); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 769 (1945) (Congress has "undoubted" power to "permit the states to regulate the commerce in a manner which would otherwise not be permissible").

silence evidences congressional intent that there be no state regulation of commerce). In other words, we presumed that congressional "inaction" was "equivalent to a declaration that inter-State commerce shall be free and untrammelled." *Welton* v. *Missouri,* 91 U. S. 275, 282 (1876). To the extent that the "pre-emption-by-silence" rationale ever made sense, it, too, has long since been rejected by this Court in virtually every analogous area of the law.

For example, ever since the watershed case of *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), this Court has rejected the notion that it can create a federal common law to fill in great silences left by Congress, and thereby pre-empt state law. We have recognized that "a federal court could not generally apply a federal rule of decision, despite the existence of jurisdiction, in the absence of an applicable Act of Congress." *Milwaukee* v. *Illinois,* 451 U. S. 304, 313 (1981).[9]

The limited areas in which we have created federal common law typically involve either uniquely federal issues or the rights and responsibilities of the United States or its agents. See *Texas Industries, Inc.* v. *Radcliff Materials, Inc.,* 451 U. S. 630, 641 (1981). But where a federal rule is not essential, or where state law already operates within a particular field, we have applied state law rather than opting to create federal common law. See *United States* v. *Kimbell Foods, Inc.,* 440 U. S. 715, 730 (1979) (rejecting "generalized

---

[9] See also *Atherton* v. *FDIC,* 519 U. S. 213, 218 (1997) (rejecting the "judicial 'creation' of a special federal rule of decision" and noting that "'[w]hether latent federal power should be exercised to displace state law is primarily a decision for Congress,' not the federal courts" (citation omitted)); *O'Melveny & Myers* v. *FDIC,* 512 U. S. 79, 83 (1994) (rejecting, as "so plainly wrong," the contention that federal common law governs application of state causes of action brought by the Federal Deposit Insurance Corporation as receiver for a federally insured savings and loan); *Milwaukee,* 451 U. S., at 313, n. 7, 314 ("Federal common law is a 'necessary' expedient" resorted to only when the Court is "compelled to consider federal questions 'which cannot be answered from federal statutes alone'" (citations omitted)).

pleas for uniformity" as a basis for creating federal common law); see also *Atherton* v. *FDIC*, 519 U. S. 213, 225–226 (1997) (same).

Similarly, even where Congress *has* legislated in an area subject to its authority, our pre-emption jurisprudence explicitly rejects the notion that mere congressional silence on a particular issue may be read as pre-empting state law:

> "As is always the case in our pre-emption jurisprudence, where 'federal law is said to bar state action in fields of traditional state regulation, . . . we have worked on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."'" *California Div. of Labor Standards Enforcement* v. *Dillingham Constr. N. A., Inc.*, 519 U. S. 316, 325 (1997) (citations omitted).

See also *Jones* v. *Rath Packing Co.*, 430 U. S. 519 (1977) (same); *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218 (1947) (same).

To be sure, we have overcome our reluctance to pre-empt state law in two types of situations: (1) where a state law directly conflicts with a federal law; and (2) where Congress, through extensive legislation, can be said to have pre-empted the field. See *Gade* v. *National Solid Wastes Management Assn.*, 505 U. S. 88, 98 (1992). But those two forms of pre-emption provide little aid to defenders of the negative Commerce Clause. Conflict pre-emption only applies when there is a direct clash between an Act of Congress and a state statute, but the very premise of the negative Commerce Clause is the *absence* of congressional action.

Field pre-emption likewise is of little use in areas where Congress has failed to enter the field, and certainly does not support the general proposition of "pre-emption-by-silence" that is used to provide a veneer of legitimacy to our negative Commerce Clause forays. Furthermore, field pre-emption

is itself suspect, at least as applied in the absence of a congressional command that a particular field be pre-empted. Perhaps recognizing this problem, our recent cases have frequently rejected field pre-emption in the absence of statutory language expressly requiring it. See, *e. g., O'Melveny & Myers* v. *FDIC*, 512 U. S. 79, 85 (1994) ("Nor would we adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law"). Even when an express pre-emption provision has been enacted by Congress, we have narrowly defined the area to be pre-empted. See, *e. g., Dillingham, supra,* at 324–325; *Cipollone* v. *Liggett Group, Inc.,* 505 U. S. 504, 517 (1992).

In the analogous context of statutory construction, we have similarly refused to rely on congressional *inaction* to alter the proper construction of a pre-existing statute. See *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.,* 511 U. S. 164, 180–185 (1994). And, even more troubling, the "pre-emption-by-silence" rationale virtually amounts to legislation by default, in apparent violation of the constitutional requirements of bicameralism and presentment. Cf. *INS* v. *Chadha,* 462 U. S. 919, 951–959 (1983). Thus, even were we wrongly to assume that congressional silence evidenced a desire to pre-empt some undefined category of state laws, and an intent to delegate such policy-laden categorization to the courts, treating unenacted congressional intent as if it were law would be constitutionally dubious.

In sum, neither of the Court's proffered theoretical justifications—exclusivity or pre-emption-by-silence—currently supports our negative Commerce Clause jurisprudence, if either ever did. Despite the collapse of its theoretical foundation, I suspect we have nonetheless adhered to the negative Commerce Clause because we believed it necessary to check state measures contrary to the perceived *spirit,* if not

the actual letter, of the Constitution. Thus, in one of our early uses of the negative Commerce Clause, we invalidated a state tax on the privilege of selling goods "which are not the growth, produce, or manufacture of the State." *Welton* v. *Missouri*, 91 U. S., at 278. And in *Cook* v. *Pennsylvania*, 97 U. S. 566 (1878), we struck down a state tax on out-of-state goods sold at auction. See also, *e. g., I. M. Darnell & Son Co.* v. *Memphis*, 208 U. S. 113 (1908); *Voight* v. *Wright*, 141 U. S. 62 (1891); *Walling* v. *Michigan*, 116 U. S. 446 (1886); *Webber* v. *Virginia*, 103 U. S. 344 (1881). To this day, we find discriminatory state taxes on out-of-state goods to be "virtually *per se* invalid" under our negative Commerce Clause. See, *e. g., West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186 (1994); *Associated Industries of Mo.* v. *Lohman*, 511 U. S. 641 (1994); *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269 (1988); *Maryland* v. *Louisiana*, 451 U. S. 725 (1981). Though each of these cases reached what intuitively seemed to be a desirable result—and in some cases arguably was the constitutionally *correct* result, as I describe below—the negative Commerce Clause rationale upon which they rested remains unsettling because of that rationale's lack of a textual basis.

Moreover, our negative Commerce Clause jurisprudence has taken us well beyond the invalidation of obviously discriminatory taxes on interstate commerce. We have used the Clause to make policy-laden judgments that we are ill equipped and arguably unauthorized to make. See *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 278–280 (1978) (recognizing that establishing a formula for apportioning taxes on multistate corporations would require "extensive judicial lawmaking" for which the courts are ill suited). In so doing, we have developed multifactor tests in order to assess the perceived "effect" any particular state tax or regulation has on interstate commerce. See *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977); see also *Quill Corp.* v. *North*

*Dakota,* 504 U. S. 298 (1992). And in an unabashedly legislative manner, we have balanced that "effect" against the perceived interests of the taxing or regulating State, as the very description of our "general rule" indicates:

> "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron [Portland] Cement Co.* v. *Detroit,* 362 U. S. 440, 443 [(1960)]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970).

Any test that requires us to assess (1) whether a particular statute serves a "legitimate" local public interest; (2) whether the effects of the statute on interstate commerce are merely "incidental" or "clearly excessive in relation to the putative benefits"; (3) the "nature" of the local interest; and (4) whether there are alternative means of furthering the local interest that have a "lesser impact" on interstate commerce, and even then makes the question "one of degree," surely invites us, if not compels us, to function more as legislators than as judges. See *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.,* 486 U. S., at 897–898 (SCALIA, J., concurring in judgment) (urging abandonment of the *Pike* balancing test so as to "leave essentially legislative judgments to the Congress").

Moreover, our open-ended balancing tests in this area have allowed us to reach different results based merely "on differing assessments of the force of competing analogies." *Okla-*

*homa Tax Comm'n* v. *Jefferson Lines, Inc.,* 514 U. S. 175, 196, n. 7 (1995). The examples are almost too numerous to count, but there is perhaps none that more clearly makes the point than a comparison of our decisions in *Philadelphia* v. *New Jersey,* 437 U. S. 617 (1978), and its progeny, on the one hand, and *Bowman* v. *Chicago & Northwestern R. Co.,* 125 U. S. 465 (1888), and its progeny, on the other. In *Bowman,* we recognized that States can prohibit the importation of "cattle or meat or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption," *id.,* at 489, a view to which we have adhered for more than a century, see, *e. g., Maine* v. *Taylor,* 477 U. S. 131 (1986); *Asbell* v. *Kansas,* 209 U. S. 251 (1908). In *Philadelphia,* however, we held that New Jersey could not prohibit the importation of "solid or liquid waste which originated or was collected outside the territorial limits of the State." 437 U. S., at 618 (internal quotation marks omitted). The cases were arguably distinguishable, but only on policy grounds and not on any distinction derived from the text of the Constitution itself.

Similarly, we have in some cases rejected attempts by a State to limit use of the State's own natural resources to that State's residents. See, *e. g., Hughes* v. *Oklahoma,* 441 U. S. 322, 338 (1979). But in other cases, we have upheld just such preferential access. See, *e. g., Sporhase* v. *Nebraska ex rel. Douglas,* 458 U. S. 941, 955–957 (1982); cf. *Baldwin* v. *Fish and Game Comm'n of Mont.,* 436 U. S. 371 (1978). Again, the distinctions turned on often subtle policy judgments, not the text of the Constitution.

In my view, none of this policy-laden decisionmaking is proper. Rather, the Court should confine itself to interpreting the text of the Constitution, which itself seems to prohibit in plain terms certain of the more egregious state taxes on interstate commerce described above, see *supra,* at 618, and leaves to Congress the policy choices necessary for any further regulation of interstate commerce.

## II

Article I, § 10, cl. 2, of the Constitution provides that "[n]o State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports . . . ." To the 20th-century reader, the Clause appears only to prohibit States from levying certain kinds of taxes on goods imported from or exported to *foreign* nations. But a strong argument can be made that for the Constitution's Framers and ratifiers—representatives of States which still viewed themselves as semi-independent sovereigns—the terms "imports" and "exports" encompassed not just trade with foreign nations, but trade with *other States* as well.

The late Professor William Crosskey, in a persuasive treatment of this subject nearly a half century ago, unearthed numerous founding-era examples in which the word "import" referred to goods produced in other States. See The True Meaning of the Imports and Exports Clause: Herein of "Interstate Trade Barriers," in 1787, 1 Politics and the Constitution in the History of the United States 295–323 (1953). Crosskey recounts, for example, that merchants frequently published advertisements in the local newspapers announcing recent shipments of such "imported" goods as "Philadelphia Flour," "Carolina Rice," and "Connecticut Beef." *Id.*, at 298.[10] Similarly, the word "export" was used to refer to

---

[10] See also Gazette of the State of Georgia, Oct. 11, 1787, p. 3, col. 3 ("Just imported . . . Superfine Philadelphia flour"); Newport [R. I.] Mercury, June 12, 1784, p. 4, col. 2 ("Just imported . . . Burlington [New Jersey] and Carolina, Pork, in Barrels"); *ibid.* ("Just imported . . . best Philadelphia Flour"); South Carolina Weekly Gazette, Sept. 13, 1783, p. 3, col. 2 ("Just imported, In the Sloop Rosana, . . . from Rhode-Island, . . . Potatoes, Apples, Onions by the bunch and bushel, Beats, Carrots, and good warranted Cheese"); Columbian Herald [Charleston, S. C.], Nov. 26, 1787, p. 4, col. 4 ("Just imported, From Philadelphia, . . . Dr. Martin's Celebrated Medicine for Cancers, Ulcers, Wens, Scurvies, Tetters, Ringworms, &c."); Newport Mercury, July 31, 1786, p. 2, col. 2 (complaining that "last year upwards of 700,000 bushels of corn were imported into [South Carolina] from North Carolina and Virginia"); Columbian Herald, Feb. 14, 1785, p. 2,

goods shipped both to other States and abroad. One writer, for example, urged his fellow Connecticut citizens to manufacture stockings in sufficient quantity not only for the supply of Connecticut "but for *exportation to other States*" as well. Letter from "A. C.," Massachusetts Centinel, Sept. 5, 1787, p. 1, col. 1, reprinted from New Haven Gazette (emphasis added). Another argued that Connecticut could enrich itself "[b]y making and refining *Cyder* for *exportation* with which we might supply the *Southern States,* as well as the large provinces of Quebec and Nova-Scotia." Connecticut Farmer, New-Haven Gazette, Oct. 6, 1785, p. 2, col. 3 (second and third emphases added).

More significantly, the early statute books are replete with examples of these commonplace 18th-century understandings of the terms "import" and "export." The Virginia cheeseduty Act of October 1786, for example, provided for a duty of "three pence a pound on all cheese . . . *imported* into this commonwealth." 12 Hening, Virginia Statutes at Large, ch. 29, § 2, p. 289 (emphasis added). As complaints published in New England newspapers indicate, that duty was imposed on cheese produced by the New England States. See Salem [Mass.] Mercury, Mar. 3, 1787, p. 2, col. 2. Moreover, the duty was but one of many imposed by Virginia, which had for some time, it seems, "imposed like duties upon the importation of New-England rum, Lynn [Mass.] Shoes, Cheese, Cordage, and a variety of other articles manufactured in the Eastern States." Independent Chronicle [Boston], Apr. 19, 1787, p. 3, col. 2; see 11 Hening, Virginia Statutes at Large, ch. 8, § 8, pp. 121–122 (Oct. 1782) (imposing a tonnage duty "on all vessels . . . from or to foreign parts, or from or to any of the United States," and an impost duty on goods "imported or brought into this commonwealth . . . from any port or place whatsoever").

---

col. 4 (complaint about legislation pending in Georgia—later adopted—taxing "all goods imported into the back part of that state from South Carolina").

Maryland, for its part, taxed certain "articles exported out of" the State, including flour shipped to New England. 1784 Md. Laws, ch. 84, § 1; see also Letter from "A Citizen," Norwich [Conn.] Packet, Jan. 17, 1788, p. 1, col. 1 ("The New-England States have imported, for four years past, from the State of Maryland, upwards of twenty five thousand barrels of flour annually—on which they have been obliged to pay a duty for the liberty of exportation"). And, when it provided for the inspection of salted foods "exported and imported from and to the town of Baltimore," Maryland expressly included salted foods "brought or imported into the said town, from any part of this state, or any one of the United States, or from any foreign port whatever." 1786 Md. Laws, ch. 17, § 5.

In similar fashion, Connecticut adopted an excise tax that distinguished between "imported Chocolate," taxed at three pence per pound, and "Chocolate made within this State," taxed at one penny per pound. 1783 Conn. Acts and Laws 619. And in May 1784, Connecticut adopted an import duty that expressly applied to certain enumerated articles "imported or brought into this State, by Land or Water, from any of the United States of America." 1784 Conn. Acts and Laws 271.[11]

---

[11] Some commentators have argued that the phrase "imported or brought" suggests that Connecticut lawmakers intended to distinguish between foreign goods "imported" and other States' goods "brought" into the State. This supposed distinction between "imported" and "brought" is not consistent with the remainder of the statute, however. For example, the second paragraph of the Act uses the phrase "brought or imported into this State" when referring exclusively to items "that are not the Growth, Produce, or Manufacture of the United States." 1784 Conn. Acts and Laws 271. And conversely, "imported" is used alone in contexts where it plainly covers goods produced in other States. See, e. g., id., at 309 (setting duty for sugar, "whether the Produce or Manufacture of the United States, or not, imported into this State"); cf. 1786 Md. Laws, ch. 17, § 6 (setting standards for "all beef and pork barrels brought to, or imported into, Baltimore-town, from any part of this state"). The more plausible view, therefore, is that the words "brought" and "imported" are

In fact, when state legislators of the founding generation intended to limit the term "imports" only to goods of foreign origin, they were quite adept at so indicating. See *id.*, at 269 (provision regarding merchants "who shall import annually into [New London or New Haven] from Europe, Asia or Africa, Goods, Wares and Merchandise, the Growth, Produce or Manufacture of said Countries"); *id.*, at 270 (setting duties for "Goods imported into this State from any Foreign Port, Island or Plantation not within any of The United States"); 2 New York Laws, ch. 7, p. 12 (1886) (Act of Nov. 18, 1784, setting duties for certain "articles imported from Europe"). Thus, based on this common 18th-century usage of the words "import" and "export," and the lack of any textual indication that the Clause was intended to apply exclusively to foreign goods, it seems likely that those who drafted the Constitution sought, through the Import-Export Clause, to prohibit States from levying duties and imposts on goods imported from, or exported to, other States as well as foreign nations, and that those who ratified the Constitution would have so understood the Clause.

Our Civil War era decision in *Woodruff* v. *Parham*, 8 Wall. 123 (1869), of course, held that the Import-Export Clause applied only to foreign trade. None of the parties to these proceedings have challenged that holding, but given that the common 18th-century understanding of the words used in the Clause extended to interstate as well as foreign trade, it is

---

largely redundant and, to the extent they refer to different activities, the distinction in the phrase is not between foreign goods "imported" into Connecticut, on the one hand, and other States' goods "brought" into Connecticut, on the other, but between goods of both kinds—domestic and foreign—commercially "imported" in quantity and those "brought" in limited quantities by individuals in their own baggage. Compare 1784 Conn. Acts and Laws, at 272 (using the phrase "imported or brought" when referring both to a ship's cargo and to the "Baggage of Passengers"), with *id.*, at 273 (using only the word "imported" when referring solely to the ship's cargo).

worth assessing the *Woodruff* Court's reasoning with an eye toward reconsidering that decision in an appropriate case.

The *Woodruff* Court began with a textual argument, contending that the power to levy "imposts" given to Congress in Art. I, § 8, cl. 1, applied only to foreign imports. Such a limited reading of the word "imposts" in that Clause was necessary, the Court claimed, because any other reading would be nonsensical: Goods "imported" by one State from another State, explained the Court, would be an "export" of the State where the goods were produced or grown, and the supposed power given to Congress in Art. I, § 8, to levy an "impost" on such "imports" would be prohibited by the Art. I, § 9, provision that "[n]o Tax or Duty shall be laid on Articles exported from any State." This apparent tension between § 8 and § 9 led the Court to believe that the word "imposts" in § 8 must be read as applying only to foreign imports in order to avoid a partial negation of the Art. I, § 8, power. The Court then extrapolated from this reading that the word "impost" in Art. I, § 10, similarly had the same limited application to foreign imports. As we have already seen, however, see *supra*, at 621–623, the word "import" derived its meaning from the jurisdiction into which goods were imported; consequently, it does not necessarily follow that the imports on which Congress was given the power to lay "imposts" in Art. I, § 8, were identical to the imports and exports on which the several States were prohibited from levying "Imposts or Duties" by Art. I, § 10.[12]

The *Woodruff* Court bolstered its textual argument with two further arguments, neither of which appear still to be

[12] Even assuming that the word "impost" in the two Clauses applied to the same class of "imports," there is nothing nonsensical in reading "impost" in Art. I, § 8, as applicable to interstate as well as foreign trade. It is frequently the case that a broad grant of power in one Clause is restricted by another Clause. Moreover, a State could also import goods from a federal territory, and the congressional power to lay an impost on such (nonforeign) trade would not run afoul of the Art. I, § 9, prohibition.

valid, if ever they were: First, that in the history of the Constitution's formation and adoption, "the words imports and imposts were used with *exclusive* reference to articles imported from foreign countries," *id.*, at 133 (emphasis added), and second, the policy concern that goods imported from other States would be forever exempt from tax if the Clause were read to apply to interstate imports.

As to the first nontextual argument, the *Woodruff* Court was selective in its use of history, to say the least. It first asserted that, in Articles VI and IX of the Articles of Confederation, the words "imports, exports, and imposts are used with exclusive reference to foreign trade, because [those articles] have regard only to the treaty-making power of the federation." *Id.*, at 134. Even if the *Woodruff* Court's assertion was accurate as to Articles VI and IX, which is doubtful,[13] Article IV cannot be so read. That Article expressly permitted "duties" and "impositions" to be levied on property removed from one State to another, as long

---

[13] Article VI, § 3, merely provided that "[n]o State shall lay any imposts or duties, which may interfere with any stipulations in treaties, entered into by the United States in Congress assembled." 1 Stat. 5. And Article IX provided: "The United States, in Congress assembled, shall have the sole and exclusive right and power of . . . entering into treaties and alliances, provided that no treaty of commerce shall be made, whereby the legislative power of the respective States shall be restrained from imposing such imposts and duties on foreigners, as their own people are subjected to, or from prohibiting the exportation or importation of any species of goods or commodities whatsoever. . . ." 1 Stat. 6. As should be evident, neither Article requires a reading of "impost" as applicable exclusively to foreign imports. The better reading is that when the States levied imposts in their individual capacities, they could not interfere with treaties enacted by the States in their collective capacity. In fact, the two provisions, read together, suggest the existence of much broader classes of "imposts," "imports," and "exports," and that only the *subclass* of imposts interfering with foreign trade might be prohibited. The absence of this very qualifier in the later enacted Import-Export Clause creates a negative inference that the unqualified constitutional language covered more than did the limited prohibition in the Articles of Confederation.

as the property was not owned by "the United States, or either of them."[14]

The *Woodruff* Court next turned to the use of the words "duty" and "import" in the Continental Congress. The Court noted that the Continental Congress recommended that the States give it permission to levy a duty of five percent on all "foreign merchandise imported into the country," and that, though "imperfectly . . . preserved," the debates in the Congress "are full of the subject of the injustice done by the States who had good seaports, by duties levied in those ports on foreign goods designed for States who had no such ports." *Id.*, at 134.

There is, of course, no question that the ability of seaport States to tax the foreign imports of their neighbors was a source of discord between the States, and continued to be so through the Constitutional Convention itself. In order to support its contention, however, the *Woodruff* Court was obligated to show not merely that the words "duty," "impost," and "imports" were used in reference to foreign goods, but

---

[14] Indeed, some New Englanders apparently believed that the Virginia duty on New England cheese, see *supra*, at 622, was contrary to Article IV's provision that "no imposition, duties or restriction, shall be laid by any State, on the property of the United States, or either of them." 1 Stat. 4. See Salem [Mass.] Mercury, Mar. 3, 1787. The general view of the Clause, however, and certainly the view of the several States that imposed duties on interstate trade, see *supra*, at 622–623, was that it applied only to goods actually owned by the States, not to goods grown or manufactured within them. See Salem [Mass.] Mercury, Mar. 3, 1787 ("[T]he proper construction of that part of the Articles of Confederation is, that no state in the union shall lay a tax on publick property imported therein—for, be it remembered, Congress were, at the time the Confederation was formed, exporters of almost every necessary for carrying on the war, & the clause alluded to was intended to prevent any individual state from laying a duty on those necessary supplies"); see also 12 Hening, Virginia Statutes at Large, ch. 40, § 3, pp. 304–305 (Oct. 1786) (distinguishing between articles "which are the property of the United States, or either of them," and articles "which shall be proved to be of the growth, produce or manufacture of the State from which they shall be imported").

that foreign goods were the *exclusive* reference. Contrary to the *Woodruff* Court's claim, the historical record does not appear to support such an exclusive use of the words.

The records of the Continental Congress contain numerous examples of the words "duty," "impost," and "import" being used with reference to interstate trade. In 1785, for example, in response to the increasing animosities between the States engendered by conflicting interstate trade regulations, an amendment to the Articles of Confederation was proposed that would have vested in the Continental Congress the power to lay "such imposts and duties upon imports and exports, as may be necessary for the purpose" of "regulating the trade of the States, as well with foreign Nations, *as with each other*." 28 Journals of the Continental Congress, Mar. 28, 1785, p. 201 (1933) (emphasis added). Two provisos within the proposed amendment further suggest that interstate imports and exports were very much within the purview of the amendment: First, "that the Citizens of the States shall in no instance be subjected to pay higher imposts and duties, than those imposed on the subjects of foreign powers"; and second, "that the Legislative power of the several States shall not be restrained from prohibiting the importation or exportation of any species of goods or commodities whatsoever." *Ibid.*

As early as 1779, the problems posed by *interstate* trade barriers had become acute enough to warrant a request by the Continental Congress urging the States "to repeal all laws or other restrictions laid on the inland trade between the said states." Resolution of Aug. 25, 1779, 14 Journals of the Continental Congress 986; *id.*, at 996 (adopting resolution). While this particular resolution does not use the words "duties" or "imports," it seems evident from a survey of the statutory "duties" being levied by some States on goods "imported" from other States, see *supra*, at 622–623, that the resolution was directed at just such duties on imports from other States.

Many of the States ignored the request, of course, and their "rival, conflicting and angry regulations" continued to be a source of conflict until the new Constitution went into effect. See Madison, Preface to Debates in the Convention of 1787 (Draft), *circa* 1836, in 3 Farrand 547; see also, *e. g.,* William Ellery to Samuel Dick, Aug. 2, 1784, in 7 Letters of Members of the Continental Congress 579 (E. Burnett ed. 1934) (hereinafter Burnett's Letters) (predicting that Rhode Island would not agree to the national impost requested by the Congress in 1781 "until the States shall have agreed not to lay any *duties* upon goods *imported* into them from any one of their Sister States; perhaps not then" (emphasis added)); William Samuel Johnson to Jonathan Sturges (draft), Jan. 26, 1785, in 8 Burnett's Letters 13 (noting that the Continental Congress was considering asking the States "to invest Congress with the Power of regulating their Trade as well with foreign Nations *as with each other,*" a move which "might probably overturn the System [of "duties" on "imported" goods, see *supra,* at 623,] Conn[ecticu]t has adopt'd as relat[iv]e to N. Y. which it is said she will counteract by regulat[ion]s of her Assembly now convening" (emphasis in original)).

In fact, the animosity engendered by the various duties levied on imports from other States was one of the motivating factors leading to the Annapolis Convention of 1786. See T. Powell, Vagaries and Varieties in Constitutional Interpretation 182 (1956) ("When the Framers spoke in 1787, the states were substantially sovereign, and their exercises of sovereign powers in adversely affecting trade from sister states was one of the factors leading to the Annapolis conference"). As noted by Tench Coxe, one of the Pennsylvania Commissioners appointed to attend the Convention: "Goods of the growth product and manufacture of the Other States in Union were [in several of the States] charged with high Duties upon importation into the enacting State—as great in many instances as those imposed on foreign Articles of

the same Kinds." Coxe, Letter to the Virginia Commissioners at Annapolis, Sept. 13, 1786, reprinted in 9 The Papers of James Madison 125 (Rutland ed. 1975). Coxe thought the very purpose of the Annapolis Convention had been "[t]o procure an alteration" of this and other practices, which were, he added, "evidently opposed to the great principles and Spirit of the Union." *Ibid.*

Similarly, one of the first criticisms leveled against the Articles of Confederation during the ensuing Federal Convention was the general Government's inability to prevent "quarrels between states," including those arising from the various "duties" the States imposed upon each other, both on foreign goods moving through the seaport States and on each other's goods. See 1 Farrand 19, 25 (Edmund Randolph, May 29); see also Madison, Preface to Debates in the Convention of 1787 (draft), *circa* 1836, in 3 Farrand 547–548 ("Some of the States, as Connecticut, taxed imports as from Massts higher than imports even from G. B. of w[hi]ch Massts. complained to Virga. and doubtless to other States").

While the focus of the Convention quickly moved beyond the mere abolition of trade barriers, of course, there are passages in the available Convention debates which indicate that interstate trade barriers remained a concern, and that the words of the Import-Export Clause applied to interstate, as well as to foreign, trade. George Mason, for example, proposed to exempt from the Import-Export Clause prohibition duties necessary for the States' execution of their inspection laws. Otherwise, he argued, the "restriction on the States would prevent the incidental duties necessary for the inspection & safe-keeping of their produce, and be ruinous to the [Southern] Staple States." 2 Farrand 588 (Sept. 12). James Madison seconded the motion, and his comment that any feared abuse of the power to levy duties on exports for inspection purposes was perhaps best guarded against by "the right in the Genl. Government to regulate trade *between State & State,*" *id.,* at 588–589 (emphasis added),

strongly suggests that exports to other States were within the Clause's reach.[15]

These references to duties on *interstate* imports and exports are bolstered by several more in the ratification debates. See, *e. g.*, 2 J. Elliot, Debates on the Federal Constitution 57–58 (2d ed. 1891) (hereinafter Elliot) (Dawes, Massachusetts ratifying convention) ("As to commerce, it is well known that the different states now pursue different systems of duties in regard to each other. By this, and for want of general laws of prohibition through the Union, we have not secured even our own domestic traffic that passes from state to state" (original emphasis deleted)). Indeed, one of the principal Anti-Federalist complaints against the new Constitution was that States were prohibited from laying *any* duties or imposts on imports or exports, a prohibition that, in their view, left only direct taxation as a means for the States to support their own governments. See, *e. g.*, Brutus 1, Oct. 18, 1787, in 13 Documentary History of the Ratification of the Constitution 415 (J. Kaminsky & G. Saladino eds. 1981) (hereinafter Doc. Hist.) ("No state can . . . lay any duties, or imposts, on imports, or exports . . . . [T]he only mean therefore left, for any state to support its government and discharge its debts, is by direct taxation").[16] This

---

[15] Furthermore, in response to concerns that the inspection exemption might be used merely as a pretext for taxing neighboring States, see 2 Farrand 589, Mason's proposal was further amended to make any such State inspection laws "subject to the revision and controul of Congress," *id.*, at 607, 624. The need for, and existence of, this further limitation on the States' authority to tax imports and exports suggests that the Commerce Clause power itself, referred to by Madison, would not operate to limit the States of its own accord. See *supra*, at 613–614, n. 7.

[16] See also John Quincy Adams to William Cranch, Oct. 14, 1787, in 14 Doc. Hist. 222 ("How will it be possible for each particular State to pay its debts, when the power of laying imposts or duties, on imports or exports, shall be taken from them—By direct taxes, it may be said"); George Lee Turberville to James Madison, Dec. 11, 1787, in *id.*, at 407 ("Why shou'd the states be prevented from raising a Revenue by Duties or

complaint overstates the case somewhat—States could still levy excises, and duties other than those on imports and exports. See, *e. g.*, The Federalist No. 32, p. 151 (M. Beloff ed. 1987) (A. Hamilton) ("([W]ith the sole exception of duties on imports and exports)[, States] would, under the plan of the convention, retain [the] authority [to raise their own revenues] in the most absolute and unqualified sense"). But it does suggest that the Anti-Federalists, at least, viewed the Import-Export Clause as prohibiting all other state taxes, including the duties then in place on goods imported from neighboring States. And moves in various States shortly after the Constitution's ratification to repeal the offending duties on interstate trade support the Anti-Federalist view. Compare An Act repealing the Laws made for levying and collecting a Duty on Articles imported into this State, 1789 Conn. Acts and Laws 377 (Jan. 1789), with, *e. g.*, An Act for levying and collecting Duties on the Importation of certain Articles, and for appropriating the same, 1784 Conn. Acts and Laws 309 (Oct. 1784) (providing for, inter alia, a duty of three pence "on each Pound of Sugar . . . whether the Produce or Manufacture of the United States, or not, imported into this State").

Justice Nelson, of course, pointed out in his *Woodruff* dissent that a lack of "security or protection" against "obstructions and interruptions of commerce among the States" was "one of the principal grievances that led to the Convention of 1787, and to the adoption of the Federal Constitution." 8 Wall., at 140–141. But he seems not to have had in his arse-

---

Taxes—on their own Exports? Are the states not bound down to direct Taxation for the support of their police & government?"); A Federal Republican, A Review of the Constitution Proposed by the Late Convention, Oct. 28, 1787, in 3 The Complete Anti-Federalist 79 (H. Storing ed. 1981) (hereinafter Storing) ("The [Import-Export Clause] is reducing [the States] to the necessity of laying direct taxes"); Vox Populi, Massachusetts Gazette, Oct.–Nov. 1787, in 4 Storing 47 ("Must we be confined to a dry tax on polls and estates . . . ?").

nal many of the historical materials cited above, which indicate that the *words* used in the Import-Export Clause encompassed, at the time the Constitution was written, both interstate and foreign trade.[17]   Indeed, the *Woodruff* majority itself felt compelled to note that its "research [had] extended" only so far as permitted by "the discussions on this subject, as they have come down to us from that time." *Id.*, at 136; see also *id.*, at 134 (referring to the "imperfectly . . . preserved" discussions of the Continental Congress). Whatever the cause, the *Woodruff* Court's analysis of the historical usage of the words overlooked many contrary examples and is thus not especially compelling.

The second contention that the *Woodruff* Court used to bolster its textual argument was a policy concern based on an unnecessarily broad view of the Import-Export Clause's prohibition.   The *Woodruff* Court believed that the prohibition on "Duties or Imposts on Exports or Imports" exempted imported articles, and the merchants who traded in them, from state taxation of *any* kind, at least so long as they remained in their original packages.   *Id.*, at 137.   This view of the Clause's prohibition would result in "the grossest injustice," said the Court, were the Clause to be read as applying to "articles brought from one State into another," for "[n]either the State nor the city which protects [the import merchant's] life and property [could] make him contribute a dollar to support its government."   *Ibid.*

---

[17] Farrand did not publish his volumes until 1911 (although the *Woodruff* Court did have available to it Madison's notes, as well as the more perfunctory convention journal); Burnett's Letters were published between 1921 and 1936; the Journals of the Continental Congress were published between 1904 and 1937; volume 9 of The Papers of James Madison, in which Tench Coxe's letter was first reprinted, was not published until 1975; and a useful, readily accessible collection of the various Anti-Federalist writings was not available until 1981.   This is not to say that the original documents reprinted in these volumes would not have been available to the *Woodruff* Court.   But our ready access to, as well as our appreciation of, such documents has increased over time.

*Woodruff*'s broad reading of the Clause's prohibition was explicitly adopted three years later in *Low* v. *Austin,* 13 Wall. 29 (1872), a case involving foreign imports. But we expressly overruled *Low* 20 years ago, in *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276, 279 (1976), holding that the Import-Export Clause "cannot be read to accord imported goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin for services which the State supplies," *id.,* at 287; cf. *United States* v. *International Business Machines Corp.,* 517 U. S. 843, 857–859 (1996) (distinguishing the Art. I, § 9, cl. 5, Export Clause, which bars the United States from imposing any *tax* on exports, from the Import-Export Clause, which prohibits States from levying only *duties* and *imposts*). While *Michelin* and *Low* dealt with foreign imports, the expansive interpretation of the Import-Export Clause's prohibition rejected by *Michelin* was the same interpretation that gave the *Woodruff* Court pause and that seems to have been an impetus to its refusal to read the Clause as applying to imports from other States. Thus, after *Michelin,* the second argument the *Woodruff* Court used to bolster its weak textual analysis—that it would be a gross injustice to prohibit States from levying *any* taxes on goods which were produced in other States—no longer has any force.

There is nothing else of consequence to support the *Woodruff* Court's holding. The only remaining argument made by the *Woodruff* majority was that it was "improbable" that the Convention would have permitted States to tax "imports" from other States merely with the assent of Congress, because the revenues that would accrue to Congress by granting such assent would prove too great a temptation for Congress to serve as a neutral arbiter regarding such taxes. *Woodruff, supra,* at 133. The *Woodruff* Court's speculation was without historical support, however, and pales in comparison to the substantial evidence described above regard-

ing the meaning of the words in the Clause, see *supra*, at 621–624.[18]

In short, there is little in the *Woodruff* opinion to sustain its holding, and its weakness is even more evident given the contrary precedent rejected by the *Woodruff* Court. In *Brown* v. *Maryland*, 12 Wheat. 419, 449 (1827), Chief Justice Marshall, writing for the Court, suggested: "[W]e suppose the principles laid down in this case [namely, that a state license tax on importers of foreign articles was invalid both under the Import-Export Clause and the Act of Congress which authorizes importation] to apply equally to importations from a sister State." And just eight years before *Woodruff*, Chief Justice Taney, writing for a unanimous Court, struck down a stamp tax on bills of lading for gold being shipped from California to New York, holding that "the State tax in question is a duty upon the *export* of gold and silver, and consequently repugnant to the [Import-Export] clause in the Constitution." *Almy* v. *California*, 24 How. 169, 175 (1861) (emphasis added).

Chief Justice Marshall's statement in *Brown* was merely dicta, of course, but the *Woodruff* majority's rejection of the precedential force of *Almy*, based solely on its assertion that "[i]t seems to have escaped the attention of counsel on both sides, and of the Chief Justice who delivered the opinion,

---

[18] Indeed, were I similarly to speculate, I would not find it "improbable" that the Convention would have trusted Congress to serve as a referee between individual States. Since many States would necessarily be harmed by a single State's impost, the institutional checks would in all likelihood be sufficient to counter any revenue "temptation" Congress might have faced, especially given the extensive revenue authority granted directly to Congress in Art. I, §8, cl. 1. My "speculation" is at least consistent with the recorded Convention debates. Roger Sherman proposed the requirement that any revenues raised by congressionally approved state imposts go into the federal treasury not as a separate means of raising national revenues, but to ensure that the States not use a protectionist impost as a pretext for raising revenues from other States. See 2 Farrand 441–442 (Aug. 28).

that the case was one of inter-state commerce," 8 Wall., at 137, is harder to sustain. The *Almy* Court expressly noted that Mr. Almy was charged with failing to pay the stamp tax on a bill of lading for "a quantity of gold-dust for transportation to New York" from San Francisco, 24 How., at 172, and the explicit "question presented by the case" was whether a State had a right "to tax such instruments when used in *commerce among the States*," Brief for Plaintiff in Error in *Almy* v. *California*, D. T. 1860, No. 23, pp. 1–2 (emphasis added); see also *id.*, at 3 (referring to fact that the tax was on bills of lading "for exports to other States"). *Woodruff's* rejection of *Brown* and *Almy*—precedent which better reflected the historical record and common usage of the Clause's words—was thus highly questionable.

In sum, it would seem that *Woodruff* was, in all likelihood, wrongly decided. Of course, much of what the Import-Export Clause appears to have been designed to protect against has since been addressed under the negative Commerce Clause. As the majority recognizes, discriminatory state taxation of interstate commerce is one of the core pieces of our negative Commerce Clause jurisprudence. *Ante*, at 581. Were it simply a matter of invalidating state laws under one Clause of the Constitution rather than another, I might be inclined to leave well enough alone. Indeed, our rule that state taxes that discriminate against interstate commerce are virtually *per se* invalid under the negative Commerce Clause may well approximate the apparent prohibition of the Import-Export Clause itself. But, as already described, without the proper textual roots, our negative Commerce Clause has gone far afield of its core—and we have yet to articulate either a coherent rationale for permitting the courts effectively to legislate in this field, or a workable test for assessing which state laws pass negative Commerce Clause muster. Precedent as unworkable as our negative Commerce Clause jurisprudence has become is simply not entitled to the weight of *stare decisis*. See *Holder*

v. *Hall*, 512 U. S. 874, 936–937 (1994) (THOMAS, J., concurring in judgment). And it is quite possible that, were we to revisit *Woodruff*, we might find that the Constitution already affords us a textual mechanism with which to address the more egregious of state actions discriminating against interstate commerce.

## III

Were we thus to shed ourselves of our nontextual negative Commerce Clause and all the accompanying multifactor balancing tests we have employed, and instead merely apply what appears to me to be the relevant provision of the Constitution, this would seem to be a fairly straightforward case (although I reserve final judgment of the matter for a case when the Import-Export Clause is specifically addressed by the parties). Unlike the Export Clause of Art. I, § 9, which prohibits the Congress from levying *any* tax on exports, the Import-Export Clause only prohibits States from levying "duties" and "imposts." See *International Business Machines*, 517 U. S., at 857–858.

The Maine property tax at issue here is almost certainly not an impost, for, as 18th-century usage of the word indicates, an impost was a tax levied on *goods* at the time of *importation*. See, *e. g.*, The Observer-No. XII, Connecticut Courant and Weekly Intelligencer, Jan. 7, 1790, p. 1, col. 2 ("[I]mpost is a tax on merchandize, payable at the port of entry");[19] N. Bailey, An Universal Etymological English Dictionary (26 ed. 1789) (defining "impost" as "a tax or tribute, but more especially such as is received by a prince or state, for goods brought into any haven from other nations");[20]

---

[19] See also Providence Gazette and Country Journal, Feb. 13, 1790, p. 1, col. 1 (reprinting same); Gazette of the United States, Jan. 9, 1790, p. 2, col. 1 (same).

[20] See also T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796) ("Impost . . . A tax; a toll; custom paid"); S. Johnson, A Dictionary of the English Language (7th ed. 1785) ("Impost. A tax; a toll; a custom paid. Taxes and *imposts* upon merchants do seldom good to the

*Michelin*, 423 U. S., at 287 ("[I]mposts and duties . . . are essentially taxes on the commercial privilege of bringing goods into a country"). Because the tax at issue here is levied on real property—property that cannot possibly have been "imported"—the tax would not seem to fit within any of the commonly accepted definitions of "impost."

"Duty," however, though frequently used like "impost" to denote "money paid for custom of goods," An Universal Etymological English Dictionary, *supra*, does not appear to have been limited to taxes assessed at portside. See, *e. g.*, S. Johnson, A Dictionary of the English Language (7th ed. 1785) ("Duty . . . Tax; impost; custom; toll. All the wines make their way through several *duties* and taxes, *before* they reach the port" (second emphasis added)); 2 Elliot 331 (John Williams, New York ratifying convention) (noting that Congress' Art. I, § 8, power "extend[s] to duties on all kinds of goods, to tonnage and poundage of vessels, to duties on written instruments, newspapers, almanacs, &c"). In fact, "imposts" seems to have been viewed as a particular subclass of duties; the fact that the two words are used disjunctively in the Import-Export Clause suggests, therefore, that something broader than portside customs was within the constitutional prohibition.

Because of the somewhat ambiguous usage of the words "duty" and "impost," Luther Martin inquired of their meaning during the Convention. James Wilson, a member of the

---

king's revenue; for that that he wins in the hundred, he loseth in the shire. Bacon's Essays"); Barclay's Universal English Dictionary 471 (B. Woodward rev. 1782) ("Impost. A toll; custom paid for goods or merchandise"); T. Blount, A Law-Dictionary (1670) ("Impost Tribute, Tallage, or Custom; but more particularly it is that Tax which the King receives for such merchandises as are imported into any Haven, from other Nations. . . . And it may be distinguished from *Custom*, which is rather that profit which the King raises from Wares exported; but they are sometimes confounded"); cf. 7 Oxford English Dictionary 733 (2d ed. 1989) ("[I]mpost . . . A tax, duty, imposition, tribute; *spec.* a customs-duty levied on merchandise. Now chiefly *Hist*").

Committee on Detail, replied as follows: "*[D]uties* are applicable to many objects to which the word *imposts* does not relate. The latter are appropriated to commerce; the former extend to a variety of objects, as stamp duties &c." 2 Farrand 305 (emphasis in original); see also 2 Storing 54 (Luther Martin, in Maryland Convention, describing same colloquy); The Fallacies of the Freeman Detected by a Farmer, Freeman's Journal, April 1788, in 3 Storing 186–187 ("Under the term duties [in Art. I, § 8], every species of indirect taxes is included, but it especially means the power of levying money upon printed books, and written instruments"). What seems likely from these descriptions is that a duty, though broader than an impost, was still a tax *on* particular *goods* or written instruments.

It is important to note, moreover, that the Martin-Wilson colloquy is in reference to the Art. I, § 8, power given to Congress to levy duties. That power is broader than the prohibition on States found in Art. I, § 10, which reaches not all duties, but only those on "imports or exports." [21] But even without this additional limitation, one kind of tax that duties almost certainly did *not* encompass were "direct" taxes, such as property taxes and poll taxes. See, *e. g.*, The Federalist No. 12 (A. Hamilton) (distinguishing direct taxes,

---

[21] See, *e. g.*, DeWitt, Letter To the Free Citizens of the Commonwealth of Massachusetts, American Herald, Boston, Oct.–Dec. 1787, in 4 Storing 23 (noting that Congress "shall have the *exclusive* power of imposts and the duties on imports and exports, [and, implicitly, a concurrent] power of laying excises and other duties" (emphasis added)); Letters from The Federal Farmer, Oct. 10, 1787, in 2 Storing 239 (distinguishing between "impost duties, which are laid on imported goods [and] may usually be collected in a few seaport towns," and "internal taxes, [such] as poll and land taxes, excises, duties on all written instruments, etc. [which] may fix themselves on every person and species of property in the community"); Essays of Brutus, Dec. 13, 1787 in 2 Storing 392–393 (same); see also 2 Farrand 589 (noting that Morris "did not consider the dollar per Hhd laid on Tobo. in Virga. as a duty on exportation, as no drawback would be allowed on Tobo. taken out of the Warehouse for internal consumption").

such as property taxes, from indirect taxes, such as imposts, duties, and excises); Freeman's Journal, in 3 Storing 186–187 ("Under the term duties [in Art. I, § 8], every species of indirect taxes is included"); see also *Michelin, supra,* at 286, 290–291.

The tax at issue here is nothing more than a tax on real property. Such taxes were classified as "direct" taxes at the time of the framing, and were not within the class of "indirect" taxes encompassed by the common understanding of the word "duties." The amount of the Maine tax is tied to the value of the real property on which it is imposed, not to any particular goods, and not even to the number of campers served. It does not appear, therefore, to be a "duty" on "imports" in any sense of the words.[22] Even when coupled with the tax exemption for certain Maine charities (which is, in truth, no different than a subsidy paid out of the State's general revenues), Maine's property tax would not seem to be a "Duty or Impost on Imports or Exports" within the meaning of the Import-Export Clause. Thus, were we to overrule *Woodruff* and apply the Import-Export Clause to this case, I would in all likelihood sustain this tax under that Clause as well.

---

[22] Even were I to agree with the majority that a particular property tax may be a property tax in name only, see *ante,* at 574–575, and even were I to assume that travel across state lines to consume services in another State renders those traveling consumers "imports," it is difficult to characterize the tax at issue here as a duty on imports. It is, rather, as the majority recognizes, a "generally applicable state property tax." *Ante,* at 567. Maine's grant of an exemption from the tax to some charitable organizations that dispense their charity primarily to Maine residents makes the tax something less than universal, but it does not make the tax, even in practical effect, one that is levied exclusively, or even primarily, on imports. See, *e. g., New Energy Co. of Ind.* v. *Limbach,* 486 U. S. 269 (1988); *Maryland* v. *Louisiana,* 451 U. S. 725, 756 (1981); *License Cases,* 5 How. 504, 576 (1847); cf. *Davis* v. *Michigan Dept. of Treasury,* 489 U. S. 803, 821 (1989) (STEVENS, J., dissenting) (arguing, in an analogous context, that "the fact that a State may elect to grant a preference, or an exemption, to a small percentage of its residents does not make the tax discriminatory").